James A. WATTS and Walter B. Blue,
Appellants,

v.

SEWARD SCHOOL BOARD and Board of
Education, Appeal Hearing Com-
mittee, Appellees.

No. 427.

Supreme Court of Alaska.

Dec. 7, 1966.

Rehearing Denied Feb. 3, 1967.

See 423 P.2d 678.

Joe P. Josephson, Josephson & Strachan, Anchorage, for appellants.

Warren W. Matthews, Jr., Burr, Boney & Pease, Anchorage, for appellees.

Before NESBETT, C. J., DIMOND and RABINOWITZ, JJ.

NESBETT, Chief Justice.

This case is before us for the second time.

In our Opinion No. 251 of September 21, 1964,[1] we upheld the action of appellee Seward School Board in refusing to renew appellants' teaching contracts in the Seward Public Schools for 1959–60 on the ground that appellants had engaged in immoral conduct within the statutory definition of that term in S.L.A.1957, chapter 71, section 2.[2] We noted in that opinion that although appellants had made the broad general claim in their brief that their constitutional rights to assemble and speak freely had been abridged and that they had been deprived of their personal liberties and property rights without due process of law, they had failed to treat the matters adequately in their briefs or to cite any case law in support thereof. Accordingly, we declined to attempt to pass on those points.[3]

Appellants petitioned the United States Supreme Court for a writ of certiorari contending that their dismissal amounted to an unconstitutional infringement of their rights to political expression guaranteed by the First and Fourteenth Amendments to the United States Constitution.

Subsequent to the publication of our Opinion No. 251 the Alaska Legislature in 1965 enacted AS 14.20.095 providing that no rule or regulation of certain education officials may restrict or modify a teacher's right to comment and criticize public education officials, outside of school hours, to the same extent that a private individual might do so.[4] In addition, the Alaska Legislature in 1965 amended the statute which stated the causes for which a teacher's certificate might be revoked. Insofar as is pertinent this amendment simply added a definition of "immorality", defining it as the commission of an act which, under the laws of the state, constitutes a crime involving moral turpitude.[5]

1. 395 P.2d 372 (Alaska 1964).

2. S.L.A.1957, chapter 71, section 1 provided that teachers whose contracts were not to be renewed for the following year should be notified in writing on or before March 15 with a clear statement of cause including a bill of particulars.

 S.L.A.1957, chapter 71, section 2, as amended, stated:

 *Definition of Cause.* The term 'cause' as used in Section 1 above shall be based solely upon:

 (a) Incompetency which is defined as the inability or the unintentional or intentional failure to perform one's legitimate duties in a satisfactory manner; or (b) Immorality which is defined as conduct of the person tending to bring the individual concerned or the teaching profession into public disgrace or disrespect; or (c) Substantial noncompliance with the school laws of the Territory or such regulations of the Territorial Board of Education or any other governmental agency as are applicable or of the employing school district; except, that any necessary reduction of staff occasioned by a decrease in school attendance of the district may warrant, in the absence of any of the above reasons, the non-retention of a teacher.

Since recodification of Alaska laws this section has become AS 14.20.170.

3. No claim of infringement of constitutional rights had been included in appellants' statement of points nor in their specifications of error.

4. AS 14.20.095 states:

 *Right to comment and criticize not to be restricted.* No rule or regulation of the commissioner of education, a local school board, or local school administrator may restrict or modify the right of a teacher to engage in comment and criticism outside school hours, regarding school personnel, members of the governing body of any school or school district, any other public official, or any school employee, to the same extent that any private individual may exercise the right.

5. Before amendment, AS 14.20.090 stated:

 *Revocation of certificates.* (a) The department may revoke a certificate for any of the following causes:

 (1) immorality,
 (2) violation of written contract,
 (3) intemperance,
 (4) crime against the laws of the state, or
 (5) unprofessional conduct.

 (b) No certificate may be revoked until the accused has been given an opportu-

In its per curiam decision remanding the case,[6] the United States Supreme Court cited the decisions noted below which hold that supervening changes in state law that may be relevant to the disposition of a case may require that the cause be remanded for appropriate action by the state court,[7] and stated that it was granting certiorari for that purpose.

We have for our assistance in reconsidering the case, the original briefs submitted by the parties, as well as additional briefs submitted at the request of this court subsequent to remand. Also to be considered at this time is the fact that since the last briefs were filed herein and on the 15th day of April 1966, the Alaska Legislature enacted an amendment to AS 14.20.-170(a) (2) redefining immorality as a ground for nonretention of a teacher as the commission of an act which, under the laws of the state, constitutes a crime involving moral turpitude.[8]

In preparation for reconsideration of the case we requested that counsel brief the question of whether appellants' dismissal from their positions as school teachers infringed upon their rights to political expression guaranteed by the First and Fourteenth Amendments to the United States Constitution, as well as the effect on the case of the statutory changes mentioned by the United States Supreme Court in granting certiorari.

Counsel have obliged. In addition, appellants have requested that the appeal be considered de novo in the light of recent United States Supreme Court decisions. Appellee has again briefed and urged us to determine the question of whether the Seward School Board's conclusion that appellants had substantially failed to comply with Seward School Board Regulation E(7) was not a sufficient independent cause for their nonretention. Although this point was briefed and presented when this case was last before us, we found it unnecessary to consider it in view of the disposition then made of the case. We shall consider and pass on it in this decision.

In our reconsideration of the case it was eventually found necessary to order the record supplemented by the transcripts of the various proceedings had before the Seward School Board and the State Board of Education, Appeals Committee, as well as all of the exhibits received at those hearings. These transcripts were received late in May and the exhibits on June 10, 1966.

We shall consider first the effect subsequent statutory changes may have had upon our original holding that appellants' conduct was immoral within the meaning of Alaska's statute.

In order to consider this question in perspective it is necessary to first determine the type of conduct the legislature original-

nity to be heard. (§ 37–5–10 A.C.L.A. 1949)
AS 14.20.090, as amended by S.L.A.1965, chapter 41, now reads:
*Causes for revocation.* The department may revoke a certificate for any of the following causes:
(1) incompetency, which is defined as the inability or the unintentional or intentional failure to perform the teacher's customary duties in a satisfactory manner;
(2) immorality, which is defined as the commission of an act which, under the laws of the state, constitutes a crime involving moral turpitude; or
(3) substantial noncompliance with the school laws of the state or the regulations of the department.

6. Watts v. Seward School Board, 381 U.S. 126, 85 S.Ct. 1321, 14 L.Ed.2d 261, (1965).

7. Missouri ex rel. Wabash Ry. Co. v. Public Service Comm'n, 273 U.S. 126, 131, 47 S.Ct. 311, 71 L.Ed. 575, 577 (1927). Cf. Trunkline Gas Co. v. Hardin County, 375 U.S. 8, 84 S.Ct. 49, 11 L.Ed.2d 38 (1963).

8. This amendment, S.L.A.1966, chapter 104, states in part that: * * * AS 14.20.170(2) is repealed and re-enacted to read:
(2) immorality, which is defined as the commission of an act which, under the laws of the state, constitutes a crime involving moral turpitude * * *.

ly intended to cover by its definition of "immorality".

The use of the term by the legislature must be considered in context. When the facts of this case arose in 1959, SLA 1957, chapter 71, section 2,[9] listed and defined the three causes for which a teacher could be nonretained as:

(a) Incompetency—defined as the inability or failure to satisfactorily perform one's duties,

(b) Immorality—defined as 'conduct of the person tending to bring the individual concerned or the teaching profession into public disgrace or disrespect', and

(c) Substantial noncompliance with the school laws of the Territory or such regulations of the Territorial Board of Education.

Of the three causes for nonretention, "incompetency" and "substantial noncompliance" are reasonably specific. "Immorality", on the other hand, is broad and covers any and all conduct of the teacher which tends to bring disgrace or disrespect upon the teacher or the teaching profession. This definition would include all conduct from the commission of the most heinous felony down the scale of infamy to social misbehavior. The point in a teacher's conduct beyond which his behavior would tend to bring disgrace or disrespect upon him or his profession, would be one of degree depending upon the rules of society and to some extent upon the mores of the particular community.

Since it does cover such a broad range of conduct, it seems quite likely that the Alaska Legislature originally intended that "immorality" be a "catch-all" cause for nonretention, intended to serve the same purpose as that mentioned in Beilan v. Board of Public Education [10] where the United States Supreme Court stated in 357 U.S. at 406, 78 S.Ct. at 1322, 2 L.Ed. 2d at 1420:

However, the Pennsylvania statute, unlike those of many other States, contains no catch-all phrase, such as 'conduct unbecoming a teacher,' to cover disqualifying conduct not included within the more specific provisions. Consequently, the Pennsylvania courts have given 'incompetency' a broad interpretation.

In a footnote the court cited the "catch-all" provisions of the Kentucky statutes, as being "conduct unbecoming a teacher" and "during good behavior"; of Massachusetts as "conduct unbecoming a teacher" and "other good cause"; of California as "evident unfitness for service" or "unprofessional conduct"; of Illinois as "other sufficient cause" and of Indiana as "other good and just cause".[11]

The propriety of defining "immorality" as the legislature did has been questioned indirectly by appellants in their briefs and directly by the Alaska Legislative Council in an annual report to the legislature. The Council pointed out that the removal of a teacher for immoral conduct has serious implications for the teacher and suggested amendment of the provision by substitution of a definition of "immoral" in keeping with the commonly accepted sense of the term.[12]

If the original intent of the Alaska Legislature in defining immorality as it did was to provide a "catch-all" provision covering all types of conduct tending to bring public disgrace or disrespect upon the teacher or his profession, not covered by "incompetency" and "substantial noncompliance" with regulations, as seems likely, and it is desired to remove any possibility of unnecessary stigma from attaching by reason of the title of the provision, then it would seem that the reverse of the

---

9. Subsequently, the subject matter of AS 14.20.170. See also Section 37–5–12 ACLA Cum.Supp.1958.

10. 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958).

11. Id. at 406, n. 8, 78 S.Ct. at 1322, 2 L. Ed.2d at 1420.

12. "Legislative Oversight of the Administration of Statutes" pp. 21–23.

Legislative Council's recommendation should be followed. That is, the designation or title of immorality should be removed from the catch-all definition of conduct and a designation such as "conduct unbecoming a teacher" be substituted. The definition would then cover immorality in all of its aspects, including all shades of unacceptable social misbehavior, and would continue to serve the useful purpose of a "catch-all" cause which so many states have found to be a necessity in this area of legislation.[13]

The use of the term "immorality" is not new to legislation governing the teaching profession. In Appeal of Batrus [14] a statute provided that the only valid causes for termination of a teacher's contract were: immorality, incompetency, intemperance, cruelty, persistent negligence, mental derangement and persistent and wilful violation of school laws. The court held that where a teacher executed false affidavits, misrepresented and withheld important information from her employer she was guilty of

> * * * 'such a course of conduct as offends the morals of the community and is a bad example to the youth whose ideals a teacher is supposed to foster and elevate' and therefore immoral.[15]

In Negrich v. Dade County Bd. of Pub. Instruction [16] a teacher had made a false statement in his application for a teaching position and was suspended therefor seven years later. The court held that the conduct amounted to immorality since it " * * * offends the morals of the community and was inconsistent with moral rectitude".[17] In our first opinion we mentioned Appeal of Schneider,[18] where the court said:

> 'Immorality' is not necessarily confined to matters sexual in their nature. In a given context the word may be construed to encircle acts which are *contra bonos mores,* inconsistent with rectitude and the standards of conscience and good morals. Its synonyms are: corrupt, indecent, depraved, dissolute; and its antonyms are: decent, upright, good, right. Webster's International Dict. (2d ed.) [19]

In any event, the choice of the designation of "immorality" as a cause for non-retention was the legislature's. For the purposes of this case we must accept that designation and the legislative definition provided. We pass now to consider whether the conduct which the Seward School Board found that appellants had engaged in was such that it tended to bring appellants or the teaching profession into public disgrace or disrespect. In this connection we have reviewed the transcripts of the various proceedings had before the Seward School Board and the Board of Education, Appeals Committee.

13. In Board of Education of City of Los Angeles v. Swan, 41 Cal.2d 546, 261 P.2d 261, 266 (1953), cert. denied, 347 U.S. 937, 74 S.Ct. 627, 98 L.Ed. 1087 (1954) the court was considering California's "catch-all" cause of "unprofessional conduct" and quoted from Goldsmith v. Board of Education, 66 Cal.App. 157, 168, 225 P. 783, 787 (1924) in part as follows:
'the calling (of a teacher) is so intimate, its duties so delicate, the things in which a teacher might prove unworthy or would fail are so numerous, that they are incapable of enumeration in any legislative enactment.'
261 P.2d at 266. See text accompanying note 58 infra for full quote.

14. 148 Pa.Super. 587, 26 A.2d 121 (1942).

15. 26 A.2d at 124.

16. 143 So.2d 498 (Fla.App.1962).

17. 143 So.2d at 501.

18. 12 N.J.Super. 449, 79 A.2d 865 (App. Div.1951).

19. 79 A.2d at 870. For other cases construing immorality see: Tracy v. School Dist. No. 22, 70 Wyo. 1, 243 P.2d 932, 247 P.2d 153 (1952) (imbibing liquor on school premises); Appeal of Flannery, 406 Pa. 515, 178 A.2d 751 (1962) (misappropriating funds); and Horosko v. School Dist., 335 Pa. 369, 6 A.2d 866, cert. denied, 308 U.S. 553, 60 S.Ct. 101, 84 L.Ed. 465 (1939).

The controversy was set off by letters from the Seward School Board to appellants containing notices of nonretention and bills of particulars which were delivered in March of 1960. Appellants were advised that one of the reasons for their nonretention was that they were guilty of acts of immorality tending to bring them and the teaching profession into disgrace or disrespect by:

(1) Assisting in the printing and distribution of false, distorted, and misleading statements against the Superintendent of the Seward Public Schools with the intent of injuring his professional standing and destroying community and pupil confidence in the administration of the schools.

(2) By carrying to the people of the community and personally signing a petition for recall of the Seward School Board on false charges.

(3) By appearing before a union meeting in Seward and making false and misleading statements relating to the actions of the Seward School Board and making a statement similar to:

"We have been unable to get rid of the Superintendent, so we are going to get rid of the Board." (Applicable to Appellant Blue only.)

(4) By taking part in and encouraging clandestine activities of teachers with the purpose of ousting the Superintendent. (Applicable to Appellant Watts only.)

Appellants appealed their notices of nonretention. At the hearing held before the Seward School Board on April 8, 1960 both sides were represented by counsel and the entire hearing was recorded and transcribed. Both appellants admitted taking part in the printing and distribution of an Open Letter to the Seward School Board, introduced as Exhibit 7, and which reads as follows:

Seward, Alaska
May 18, 1959

AN OPEN LETTER TO THE SEWARD SCHOOL BOARD
Seward, Alaska

Gentlemen:

A Seward Branch of the American Federation of Teachers, affiliated with the AFL-CIO, has applied for and received confirmation of its charter. The AFT is a recognized organization of professional teachers and thereby commands recognition by the Seward School Board.

The Seward Local takes this means of informing the Seward School Board (and the public) of our stand in the current struggle for a good school. We hold that incidents occurring during the last year have reached such proportions as to be definitely detrimental to the morale of our teaching staff and the effectiveness of the local educational system.

1. Illegal non-retention of three teachers, reflecting on the professional reputations of those involved, in violation of Section 138 of the State School Laws, which was later corrected only after the insistence of the Seward Local of the American Federation of Teachers in a public hearing with legal counsel.

2. It is a legitimate duty of administration to maintain or create harmony in the school, and the tension noted in the pupils, and the 'friction' which some of them were aware of, does not fit this requirement.

3. Non-compliance with the fire drill regulation requiring ten fire drills per year (Sec. III, b, 4, Page 9, Rules and Regulations for the school staff/local/). This applies to both school buildings, one of which is a dangerous building.

4. Ordering the custodian, Jesse Moore, to do technical electrical work beyond his skill in a dangerous building.

5. On different occasions threatening to 'get one third of the faculty this year, and half of the remainder next year'

in an apparent attempt to 'purge' the faculty. Why Mr. Fabricius should have had this preconceived and hostile attitude is unknown. Teachers have raised the question, 'How can one man, a stranger coming into a town, have the right to tamper with the livelihood of teachers, taxpayers, property owners, and upset a school system in a single year's time?' More than bringing teachers and others into public disgrace and disrespect, actions cited have jeopardized the property and investments of several people, without giving legitimate cause and without regard for their feelings and personal rights.

6. Provoking the resignation of an outstanding teacher by forbidding him to ride the school bus in what *seems* to be a violation of the intent of the Rules and Regulations Affecting School Transportation, Page 13, Item 31, Laws of the Territory, etc., the apparent authoritarian mishandling of this resignation impairing the teacher's chances for a teaching position elsewhere. This action has placed the School Board and the taxpayers in the possible position of a suit to secure payment of the contract.

7. Dictatorial treatment of teachers, forcing them into the choice of submitting and taking it at the loss of personal dignity, or fighting back in a public spectacle.

8. Speaking in a peremptory [sic] and threatening manner in the presence of a pupil, to Mr. Smith.

9. Two specific instances have occurred violating the requirement to provide Educational Leadership in the Local Regulations.
a. Neglect to permit the development of a proper music program.
b. Information relative to the Drama Festival held at Palmer was not made known to the teachers or the student body, although the school had participated ardently and with distinction the previous year.
c. This same requirement is violated in overtly or covertly driving out Mr. Conder, Mr. Swick, Mr. Smith, and possibly others who had a definite contribution to make to the functions of the school.

10. Firing of Mrs. Davis apparently on the basis of personal dislike rather than for dereliction of duty or inefficiency. This resulted in public discussion reflecting adversely on the school, and placed Mrs. Davis in the position of consulting an attorney relative to the collection of salary allegedly due her.

We have, or can secure, sworn statements on every item.

We, the Seward Local of the American Federation of Teachers, have made every effort to secure correction of illegal, unethical, and unfair acts on the assumption that when the School Board knew of them it would take corrective action.

On May 8, 1959, in a public meeting with the School Board, compliance with the law in the matter of non-retention was secured only after great opposition and protest that the 'law had not been tested, and some educators do not regard it as a good law.'

At this same time we withheld information contained in this letter in order to keep the school functioning through the end of the school year and commencement.

We then invited the School Board to meet with us privately to clarify the items here presented, to give Mr. Fabricius and the School Board the opportunity to reply, and to determine the quality of the list of administrative statements and actions. This, in effect, was giving Mr. Fabricius and the Board the opportunity for self defense which was denied the teachers who were not given contracts in April. We arranged a meeting time to suit the convenience of the Board, and our invitation was accepted.

With the exception of Mr. Howell, President, the Seward School Board DID NOT APPEAR, nor was the administration represented.

Therefore we request an immediate special open School Board meeting Tuesday night, May 19, for the purpose of presenting to the Board and the public particulars of administration in the Seward Public Schools, with announcement of the meeting by the Board over Station KIBH. At this time the Local shall demand immediate, guaranteed, substantial improvement in administrative policies including:

1. Validation of contracts offered to formerly non-retained teachers and those affected by additional education requirements.

2. Correction of the situation regarding Mr. Smith and Mr. Swick.

3. Avoidance of unreasonable reassignment of teachers wherever possible.

4. Conformity with standard ethical and professional standard personnel policies, such as outlined by AFT and NEA, especially regarding:

 a. Notification of teachers before their written notice of non-retention.

 b. Attempting to give constructive criticism to teachers, in an effort to correct and help personnel.

It is our sincere hope that, at this meeting, we can reach mutually acceptable solutions to the many problems facing us at this time.

Very truly yours,
SEWARD LOCAL
AMERICAN FEDERATION
OF TEACHERS

Copies: To patrons of the
Seward School.

Appellants admitted that they had not presented the matters charged in the letter to the Superintendent as grievances. Upon completion of the hearing the Seward School Board affirmed its decision of non-retention and appellants appealed to the State Board of Education, Appeals Committee. After a hearing, the Appeals Committee remanded the case to the Seward School Board with directions to conduct a new hearing and to enter findings of fact and conclusions of law.

The Seward School Board then held a second hearing commencing on November 4, 1960. Both sides were represented by counsel and numerous witnesses were heard. The transcript of this hearing contains 421 pages.

Upon completion of its second hearing and pursuant to the directions of the Appeals Committee, the Seward School Board entered findings and conclusions.

In its amended decision and findings of fact the Seward School Board found as follows with respect to its charges of immorality:

11. The Board finds that Item 4 of Board Exhibit 7 referred to an altercation between Superintendent George Fabricius and the School Custodian, Jesse Moore, which was aired before the School Board. Mr. Moore was not required to do technical electrical work beyond Mr. Moore's ability.

12. Item 5 of Board Exhibit 7 is based on an allegation by James Watts that Superintendent George Fabricius told him that he would 'get one-third of the faculty this year and half of the remainder next year.' Superintendent George Fabricius did not make any such statements to Mr. Watts, nor to any other faculty member, and the charge to that effect is false. (The Board resolves the direct conflict in testimony between Mr. Fabricius and Mr. Watts on this point in favor of Mr. Fabricius, crediting the testimony of Mr. Fabricius and discrediting the testimony of Mr. Watts. This decision is based in part upon observation of the demeanor of the two witnesses.)

13. The reference in Item 5 of Board Exhibit 7 to the jeopardizing by Superintendent George Fabricius of the property investments of several people without legitimate cause referred to the non-retention of a Seward teacher named Charles Brown. Mr. Brown was not re-

tained by the Seward School system for the school year 1959 through 1960 for cause, because of his inability to maintain discipline among his students. The statement in Item 5 of Board Exhibit 7 to the effect that Superintendent George Fabricius jeopardized the property investments of several people without legitimate cause is false.

14. Item 6 of Board Exhibit 7 is a reference to the resignation of former school teacher Jack Conder. Mr. Conder tendered his resignation after an argument with Superintendent George Fabricius, during the course of which he was told by Superintendent George Fabricius that he would have to remain at school until 4:20 P.M., as required of all teachers, and that he would not be permitted to leave at 4:00 P.M. to ride the school bus home. Superintendent George Fabricius did not forbid Mr. Conder to ride the school bus, in violation of rules and regulations affecting school transportation. The statement in Item 6 of Board Exhibit 7 that the above described incident seemingly constituted a violation of the intent of the rules and regulations affecting school transportation was false.

15. Item 8 in Board Exhibit 7 refers to an incident occurring during the Spring of 1959 in which a teacher named Smith argued with Superintendent George Fabricius about the conduct of a study hall. We find, on the uncontroverted evidence, that Mr. Smith lost his temper with Superintendent George Fabricius and resigned. We find on all of the evidence that Superintendent George Fabricius did not act in a preemptory [sic] or threatening manner. We find, accordingly, that the statement in Item 8 Board Exhibit 7 is false.

16. Item 9, c of Board Exhibit 7 charges that Mr. Conder, Mr. Swick and Mr. Smith were "driven out." We find on the record as a whole that Mr. Smith and Mr. Conder tendered their resignations and Mr. Swick, by his own actions, failed to renew his contract and was, therefore, terminated. The charge' that the above three teachers were driven out is not supported by the record and we find that the charge is false.

17. The distribution of Board Exhibit 7, containing the false charges described in Findings 11, 12, 13, 14, 15 and 16, to the general public of Seward had a tendency to bring the teaching profession into public disgrace and disrespect, and constituted an act of immorality, as defined in Section 37–5–12, ACLA, 1949, as amended.

18. The distribution of Board Exhibit 7, containing false charges described in Findings 11, 12, 13, 14, 15 and 16, to the general public of Seward by Mr. Watts and Mr. Blue tended to bring Mr. Watts and Mr. Blue into public disgrace or disrespect.

19. On or about April 28, 1959, James Watts asked Mr. & Mrs. Benjamin Frampton, who at that time were members of the faculty of Seward Public Schools, if they would go along with a group of which Watts was a representative and whose purpose was to oust Mr. Fabricius from his job as Superintendent of Schools. (The Board resolves the conflict in testimony between Mr. & Mrs. Frampton and Mr. Watts in favor of Mrs. [sic] & Mrs. Frampton, crediting their testimony and discrediting that of Mr. Watts. This decision is based in part on the demeanor of the individuals.)

20. In the Spring of 1959, James Watts solicited Monty H. Richardson, who at that time was a school teacher in the Seward Public Schools, to join a group the purpose of which was to get rid of Mr. Fabricius as Superintendent of Schools. (The School Board resolves the conflict in testimony between Mr. Richardson and Mr. Watts in favor of Mr. Richardson, by crediting Mr. Richardson's testimony and discrediting the testimony of Mr. Watts. This decision is based in part upon the demeanor of the two witnesses.)

23. During a period beginning on or about May 28, 1959, and continuing into the month of June, 1959, James Watts and Walter B. Blue aided in preparing, distributing and soliciting signatures for a petition for the recall of the Seward School Board members.

26. In an attempt to gain popular support for a recall vote involving the Seward Public School Board members, Walter B. Blue made a speech to the International Longshoremen & Warehousemen's Union in Seward, Alaska, in which he stated, "We have been unable to get rid of the Superintendent, so we are going to get rid of the Board," or words to that effect.

In conclusions based upon its findings the Seward School Board found that appellants' conduct tended to bring them and the teaching profession into public disgrace or disrespect and affirmed its decisions of nonretention.

Appellants appealed and after a hearing the State Board of Education, Appeals Committee, on May 26, 1961, found in effect that the order of nonretention of the Seward School Board was supported by its findings and that its findings were supported by the evidence. The Board's decision was affirmed. Appellants then prosecuted a writ of review to the superior court.

In a mandate dated December 28, 1961, the superior court vacated the decision of the Appeals Committee and remanded the matter to the Committee to make specific findings of fact and conclusions as to the charges of immoral conduct and as to whether Regulation E(7) of the Seward School Board was ever duly adopted and if so, the details of its violation by appellants. It had been urged by appellants that there was not substantial evidence before the Seward School Board to support its finding that many of the charges made in the Open Letter were false. Upon this basis appellants were asking that review be granted and the Board record be ordered up for review. The superior court granted review as requested but did not order any part of the Board record brought up for review to determine whether there was substantial evidence to support the Board's findings. Without reviewing the transcripts of proceedings the superior court concluded as a matter of law and stated in its mandate that circulation by appellants of the Open Letter and recall petition were not immoral conduct within the meaning of the statute.

The Appeals Committee reviewed the record and in its opinion of July 31, 1962 recognized and stated at the outset that the superior court's mandate, concluding as it did that as a matter of law circulation of the Open Letter was not immoral conduct within the meaning of the statute, foreclosed it from further considering that evidence as support for the Seward School Board's finding that that act amounted to immoral conduct. The Committee then reviewed the remainder of the evidence in support of the Board's findings Nos. 19–22 and 26–28. It found substantial evidence in support of the findings and affirmed the Board's conclusions that appellants' conduct in urging teachers Frampton and Richardson to join a group which had the purpose of attempting to oust the Superintendent and the making of an inflammatory speech to the members of the I.L.W.U. tended to bring appellants and the teaching profession into disgrace or disrespect and constituted "immorality" as defined by statute.

A second writ of review was filed in the superior court and denied without opinion or explanatory order.

We have reviewed the record and the testimony elicited at the various hearings.

The Open Letter was distributed to the general public. Simultaneously copies were delivered to the members of the Seward School Board and Superintendent Fabricius. The letter requested an immediate special open meeting with the school board on the night of May 19 for the purpose of presenting to the Board and the public "particulars of administration in the Seward Public Schools." The meeting was to be

announced over radio station KIBH and it was stated that "at this time the Local shall demand immediate, guaranteed, substantial improvement in administrative policies."

Of the various charges made in the letter, the Seward School Board found six to be false.[20] Appellant Blue admitted that he had composed the original Open Letter, which was altered in some respects before being reproduced and distributed. Both appellants admitted taking an active part in the reproduction and distribution of the letter to the general public. There was some conflict in the testimony as to the truth of most of the charges, as is indicated in the Board's findings, which contain transcript citations.

The function of the Seward School Board was to conduct a fair hearing, judge the credibility of the witnesses, weigh and appraise the evidence, determine the issues of fact and announce its conclusions. In Keiner v. City of Anchorage[21] we held that a "board's findings should not be reversed if in the light of the whole record they are supported by substantial evidence, i. e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion".[22] Even though there was some conflict in the evidence in the present case as to whether the appellants' conduct constituted "immorality" as defined by the statute, there is no question but that such evidence was relevant and adequate and substantial under the above stated rule.

Of the various charges compiled, reproduced and distributed to the public at large by appellants six were found to be false statements of fact. All of the false statements in the charges reflected on the professional ability of the Superintendent. Those concerning his overbearing and arbitrary treatment of the named teachers were professionally degrading to him. All of the false statements were an indirect reflection on the administration of the Seward school system as a whole. Admittedly none of the matters covered by the false statements were submitted as grievances in accordance with Board regulations, a point which will be discussed later. Instead, a time and date were arbitrarily selected for an "Open School Board meeting" in order to present to the "Board and the public" named grievances. It was announced that at "this time the Local shall demand immediate, guaranteed, substantial improvement in administrative policies", etc. The over-all, abiding effect of the widespread circulation of the false statements and the high-handed method employed to seek redress in disregard of established procedures, could only result in a loss of respect by the public for appellants and the teaching profession in general when all of the facts became known and was immoral conduct within the meaning of that term as it was then defined by statute.[23]

We are of the opinion that the superior court erred in concluding as a matter of law that circulation of the Open Letter was not immoral conduct within the meaning of the statute. The conclusions of the Seward School Board and the Board of Education, Appeals Committee on this point are therefore reinstated and affirmed.

The Board's finding that appellant Watts had solicited teachers in the Seward schools to support a private move to oust the Superintendent was supported by the testimony of Benjamin Frampton, principal of the elementary school, that he was a member of the Seward District Teachers' Association with appellant Watts; that on the morning of April 25, 1959, between 8:30 and 9 o'clock in the morning, which was during school hours, Watts came to his room and asked to see him and his wife in his wife's first grade room; that after arriving there Watts stated that he had been

20. See text supra at pages 594, 595 and 596 where these findings of the School Board are set out:

21. 378 P.2d 406 (Alaska 1963).

22. Id. at 411.

23. See authorities cited notes 14–19 supra and accompanying text.

sent as the representative of a group and wanted the Framptons to go along with a movement to oust the Superintendent and that Watts said that they were quite sure they could get the Superintendent. Frampton testified that he replied that he thought the Superintendent was doing all right and refused to acquiesce. Mrs. Margaret Frampton verified her husband's testimony and in addition testified that she was also a fellow member of the Seward District Teachers' Association (S.D.T.A.) with Watts; that Watts served on the Association's grievance committee to meet with the School Board; that in her opinion his attempt to oust the Superintendent was improper since there was a regulation which prescribed a method for doing this. Monty Richardson, a Seward teacher, testified that he was President of the S.D.T.A. and that he had appointed Watts to be a member of the public relations committee which was also known as the grievance committee; that he knew of no plan of the Association to oust the Superintendent; that in his capacity as a representative of the S.D.T.A. Watts did not represent it in advocating ouster. When asked if Watts in his individual capacity had solicited him to join in ousting the Superintendent, Richardson became a reluctant witness, but finally admitted that "there were certain overtones during the spring of 1959" by Mr. Watts. When asked if he would "consider those overtones to be within the scope of * * * Watts' responsibilities as a member of the grievance committee of the S.D.T.A.", Mr. Richardson replied, "No sir." Appellant Watts testified that the Framptons' testimony was false, but that he considered them to be people of high character. E. G. Naegel, a Seward teacher, testified that appellant Watts stated to him in a classroom at the school that the Superintendent would probably not be in his job more than a month or so and "that if it was the last thing they would do, they would get

* * * the Superintendent" and that Mr. Watts had stated to him during a recess period when they were supervising physical education classes that neither "Mr. Frampton nor Mr. Fabricius was either capable or competent of making a decision on the right to hire and fire the teachers and he felt that the community, that the public should make that decision."

With respect to Board finding 26, concerning appellant Blue's speech to the Longshoremen and Warehousemen's Union in Seward, Mr. John Sadusky, a member of I.L.W.U. Local 60, testified that Mr. Blue attended a meeting of his local in June or July of 1959 and addressed it concerning the Seward school system, the School Board and the Superintendent; that in his speech he stated in effect "that they couldn't get rid of the Superintendent so they had to go after the School Board" and that he believed that Mr. Blue left some petitions for recall of the School Board in the union hall. Appellant Blue denied recalling that he made such a statement.

We find that there was substantial evidence to support the findings with respect to the preceding charges and pass now to consider the question of whether the conclusions based upon the findings were legally justified.

We are of the opinion that appellant Watts' conduct in soliciting teachers Benjamin Frampton and Margaret Frampton, on school premises, during school hours, to join in a private movement to attempt to oust Superintendent Fabricius was immoral conduct within the statutory definition.[24] Such an objective was not recognized or sponsored by the S.D.T.A. according to the testimony of its president and Mrs. Frampton. The framework of the regulations provided an orderly, honorable, and democratic method of processing and proving the incompetency and unfitness of the Superintendent, which could have resulted in his re-

24. There was no direct testimony that Watts had solicited teacher Monty Richardson during school hours, or that he had actually solicited the cooperation of teacher E. G. Naegel, although his representations to Naegel were made during school hours and on school premises.

moval from office if substantiated. Appellant Watts' efforts, made during school hours on school premises, were degrading, unprofessional and detrimental to morale and discipline and could only result in loss of respect by the public for him and his profession when all of the facts became known.

With respect to appellant Blue's speech before the I.L.W.U., the charge in the bill of particulars alleged that "false and misleading statements relating to the actions of the Seward School Board", were made in addition to the statement that, "we have been unable to get rid of the Superintendent, so we are going to get rid of the Board". While there is sufficient evidence in the record to support the finding that the latter statement was made, we find no evidence to support the charge that false and misleading statements were also made. The witness Sadusky did recall that a speech was made by Blue which "had to do with the School Superintendent and the School Board", but he could not recall any specific statements other than the one concerning removal of the Superintendent. The question which must be decided then, is whether the making of the statement, when considered in the light of the whole record,[25] that is, in relation to all of the recorded happenings in Seward during May and June of 1959 in which Blue participated, tended to bring him or his profession into public disgrace or disrespect.

Appellant Blue had edited the original version of the Open Letter which, even after being revised, contained numerous statements degrading to the Superintendent and indirectly to the school administration which were found to be false. Without having made any official charge against Superintendent Fabricius which could have been processed in an orderly democratic manner

and according to regulations, Blue was publicly, by innuendo, disparaging the head administrative official of the Seward school system in order to enlist support for the School Board recall petition. Blue's statement to the union members that "we" have been unable to get rid of the Superintendent would seem to infer that a majority of the teachers and/or their unions were being referred to. Actually, the movement was a private one, not supported by a majority of the newly formed Alaska Federation of Teachers. The statement was found to have been made to gain support for the School Board recall petition being circulated by appellants.[26] It implies that at least one attempt had been made to get rid of the Superintendent, which was prevented by the School Board and that the Board should therefore be recalled. The record however, contains no evidence of any previous attempt to get rid of the Superintendent. Exhibits 8, 9 and 10 of the Seward School Board hearing are signed statements made by three residents of Kenai and Soldotna, Alaska, stating that during May or June of 1959 appellant Blue had contacted and questioned them concerning Superintendent Fabricius character, administrative policies, and personal habits while a Superintendent in Kanai. The statements agreed that Blue was seeking information of a derogatory nature. When considered in relation with his other attempts to professionally discredit the Superintendent and indirectly the school administration, we believe the finding and conclusion with respect to the effect of Blue's speech to the Longshoremen's Union are supported by substantial evidence. The constitutional aspect of this question will be considered later in this opinion.

Next to be considered is the allegation by appellees that the Board finding that appel-

25. AS 44.62.570, *Scope of Review*, states in part that:
 (c) The court may exercise its independent judgment on the evidence. If it is claimed that the findings are not supported by the evidence, abuse of discretion is established if the court determines that the findings are not supported

by (1) the weight of the evidence, or (2) substantial evidence in the light of the whole record.

26. See Blue v. Stockton, 355 P.2d 395 (Alaska 1960) where appellant Blue's contention that the Seward School Board was subject to recall was upheld.

lants had failed to comply with Regulation E(7) of the Seward School Board was a sufficient independent cause for their non-retention.

In the notices of nonretention and bills of particular delivered to appellants, they were advised that they had not complied with the policies, regulations and procedures of the Seward School Board relating to the filing of complaints against the administration and the School Board and that this failure to comply had resulted in bringing the teaching profession into public disgrace and disrespect and therefore constituted "immorality" under the state. Essentially the same wording, less the allegation of immorality, was alleged as a separate and independent ground for nonretention.

With respect to the charge that appellants had failed to render substantial compliance with Board regulations, the Board found and concluded as follows:

3. Board Exhibit 12 is a true and correct copy of all the School Board regulations of the Seward Public Schools which were in effect during the school years 1958 through 1959 and 1959 through 1960. Said regulations were adopted by the Seward School Board and put into force at least prior to January 1, 1959, although, through an oversight, this was not reflected in the School Board minutes prior to that date.

4. A copy of the regulations described in Finding 3 was furnished to each teacher in the Seward Public Schools, including teachers Watts and Blue, at some time prior to January 1, 1959. Teachers Watts and Blue were familiar with these regulations, including Regulation E(7), which provides as follows:

'Grievances, complaints and communications from employees shall be submitted to the Board through the Superintendent. Any employee, or group of employees, may at any time appeal to the Board.'

5. On or about May 18, 1959, teachers Watts and Blue actively participated in the preparation of an 'Open Letter to the Seward School Board' and, further, actively participated in distributing copies of said letter to the members of the Seward School Board, to Superintendent George Fabricius, and to the public of Seward generally. Board Exhibit 7 is a copy of the 'Open Letter to the Seward School Board' so prepared and so distributed.

6. The Open Letter to the Seward School Board, described in the preceding finding, contained various charges by certain Seward School teachers, including teachers Watts and Blue, against Superintendent George Fabricius, which constituted grievances or complaints within the meaning of E(7) of the School Board Regulations.

7. None of the grievances or complaints enumerated in Board Exhibit 7 was presented to Superintendent George Fabricius prior to the distribution of the Open Letter to the Seward School Board on May 18, 1959.

8. Teachers Watts and Blue were bound to substantially comply with the School Board Regulations on and after May 18, 1959, the date of the distribution of the Board Exhibit 7 which was after the close of the school year but during a period when Watts and Blue were under contract to teach for the next school year.

9. The distribution of the Open Letter to the Seward School Board by Teachers Watts and Blue was a violation of Regulation E(7) of the School Board Regulations.

10. Although the Open Letter to the Seward School Board was delivered to Superintendent George Fabricius at substantially the same time that it was delivered to members of the School Board, this procedure did not comply with the requirements of Rule E(7) of the School Board Regulations that grievances and complaints be submitted to the School Board through the Superintendent.

In its mandate remanding this matter to the Appeals Committee, the superior court requested specific findings and conclu-

sions as to whether Regulation E(7) had ever been duly adopted by the Seward School Board and if so, the details of its violation by appellants.

With respect to the validity of Regulation E(7) the Appeals Committee, upon rehearing, accepted as an exhibit the affidavit of four members of the Seward School Board that " * * * the attached regulations of the Seward School Board were adopted and put into force prior to January 1, 1959. Through oversight this was not reflected in the School Board minutes prior to that date." The attached regulations consisted of twelve pages of detailed rules and regulations, including Regulation E(7).

The Appeals Committee held that the affidavit was adequate proof that Regulation E(7) was adopted by the Board and put into effect prior to January 1, 1959. The Committee found that there was substantial evidence to support the Board's findings that appellants did distribute the Open Letter before submitting it to the Superintendent and affirmed the Board's conclusion that this constituted substantial noncompliance with Regulation E(7).

We have reviewed the testimony concerning the charge of violation of Regulation E(7). Superintendent Fabricius testified that Exhibit 12, which comprised the rules and regulations of the Seward School Board was drafted by him from various manuals of the public schools of Alaska and that the regulations thus compiled were individually considered by all members of the Board and approved paragraph by paragraph; that they were approved at different times and that he was present when approval was given to all of the regulations, including those relating to the filing of grievances. Mr. Benjamin Frampton, principal of the elementary school, identified Exhibit 12 as being a copy of the Board regulations; stated that he had a copy in his school in the Spring of 1959; that each teacher was supplied with a copy and was required to be familiar with it. Mrs. Margaret Frampton, first grade teacher, corroborated her husband's testimony. Appellant Blue testified that he knew of the

regulations in the Spring of 1959 and was familiar with Regulation E(7). Appellant Watts stipulated that he was familiar with Exhibit 12 and Regulation E(7) in particular and that as a member of the AFT he assisted in the distribution of the Open Letter along with appellant Blue. Watts testified that with the exception of item 3 in the Open Letter, he thought none of the matters mentioned in the letter had been processed as grievances through the Superintendent; that the Open Letter was the first effort of his group to reduce to writing the grievances which it had and that appellant Watts had delivered copies of the Open Letter to the members of the Seward School Board on the same day copies were mailed to the general public. The Open Letter itself stated that the matters contained in it had been withheld from the School Board at a meeting had with the Board ten days previously, in order to await the end of the school year. The teaching contracts of appellants which were in force during the times discussed herein, were introduced into evidence as proof of their agreement to abide by the regulations of the Seward School Board.

Both appellants admitted that they were familiar with Seward School Board Regulation E(7) during the times mentioned herein. The Board finding that it had been validly adopted prior to January 1, 1959 is supported by substantial evidence and is affirmed.

By its wording this regulation required that grievances, complaints and communications from employees should be submitted to the Board through the Superintendent. It provided a right of appeal from the Superintendent to the Board.

The evidence was substantial that, with the possible exception of item 3 of the Open Letter, none of the complaints or grievances contained therein had ever been communicated to the Superintendent. A statement on page 2 of the Open Letter is to the same general effect.

The conclusion that appellants had violated their teaching contract and Regula-

tion E(7) in a substantial manner as an independent ground for their nonretention is affirmed.[27]

Next to be considered is legislation enacted by the Alaska Legislature subsequent to publication of our Opinion No. 251 on September 21, 1964.

First to be considered is the amendment to AS 14.20.090 [28] enacted during the 1965 session mentioned earlier in this opinion. This amendment reduced the number of causes for which a teacher's certificate could be revoked from five to three. Immorality was retained as a cause with a definition of the term added, defining it as "the commission of an act which, under the laws of the state, constitutes a crime involving moral turpitude". This is the amendment referred to by the United States Supreme Court in Watts v. Seward School Board [29] when this case was remanded to us for reconsideration.

Appellant argues that this amendment is an indication of the intent of the legislature as to the meaning to be given to immorality as a cause for nonretention.

■ The weakness in this argument is that the statute stating the causes for revocation of a teacher's certificate has never been involved in this case. Appellants were nonretained under SLA 1957, chapter 71, section 2 [30] for immorality and substantial noncompliance with school regulations. Under this statute immorality was defined as "conduct of the person tending to bring the individual concerned or the teaching profession into public disgrace or disrepect". This is the statute and the definition of immorality which the Seward School Board and the Board of Education, Appeals Committee, were applying to the facts of appellants' case in 1960. No other definition of immorality was contained in the

education laws. The fact that the legislature in 1965 amended the statute concerning revocation of teaching certificates by adding a new and different definition of immorality, while leaving in force the nonretention statute with its long standing definition of immorality, if anything, creates confusion rather than the enlightenment that appellants urge.

Additionally, House Bill 25 and Senate Bill 6 were introduced at the beginning of the 1965 session and passed by majorities in their respective houses of origin, but neither bill was enacted by the opposite body during that session. These bills proposed to amend the statute on nonretention by substituting for its definition of immorality, a definition defining it as the commission of an act involving moral turpitude. Since the filing of briefs and argument herein the Alaska Legislature enacted chapter 104 during its 1966 session. Chapter 104 was a committee substitute for Senate Bill 6, just mentioned. This amendment became effective on July 14, 1966. It repeals the original definition of immorality upon which this case was decided and defines immorality as the commission of a crime involving moral turpitude. [31]

The question now is whether this latter amendment can be given a controlling application to the facts of this case on reconsideration and if not, whether it is, nevertheless, useful in determining the original legislative intent as to the interpretation to be given to the term "immorality".

The general rule on retrospective operation of statutes is embodied in AS 01.10.-090 which states: "No statute is retrospective unless expressly declared therein." We have had occasion to apply this statute in Stephens v. Rogers Constr. Co.[32] Even before its enactment, the rule contained in

---

27. See Jepsen v. Board of Education of Community High School, 19 Ill.App.2d 204, 153 N.E.2d 417 (1958).

28. Quoted note 5 supra.

29. 381 U.S. 126, 85 S.Ct. 1321, 1322, 14 L.Ed.2d 261, 262 (1965).

30. Now AS 14.20.170(a) (2) and (3).

31. It should be noted that as a result of this amendment there is no longer a statutory cause for nonretention of a teacher for general misconduct not amounting to a crime involving moral turpitude.

32. 411 P.2d 205, 208 (Alaska 1966).

-the statute was established by case law, as noted in our opinion in Hill v. Moe.[33] The reason for the rule is perhaps best stated in Shwab v. Doyle[34] where the United States Supreme Court approved the following language from *Story*: [35]

> 'Retrospective laws are, indeed, generally unjust, and, as has been forcibly said, neither accord with sound legislation nor with the fundamental principles of the social compact.'

The Court then stated as follows:

> There is absolute prohibition against them when their purpose is punitive; they then being denominated ex post facto laws. It is the sense of the situation that that which impels prohibition in such case exacts clearness of declaration when burdens are imposed upon completed and remote transactions, or consequences given to them of which there could have been no foresight or contemplation when they were designed and consummated.[36]

■ Since S.L.A.1966, chapter 104, amending AS 14.20.170(a) (2), contains no declaration that it is to be given retrospective effect, we are foreclosed from giving it a direct controlling effect on the facts.

■ We have considered, but have been unable to adopt the view that the amendment under consideration is useful in determining the meaning which the legislature intended should be given to immorality when it first adopted this term as a designation of a cause for nonretention in 1957.

The term "immorality" first appeared in our education laws in 1929 when it was made a ground for revocation of a teacher's certificate.[37] It was not defined, but was included in the same statute with such grounds for revocation as: "violation of written contract", "intemperance", "crime against the laws of the Territory", and "unprofessional conduct". No statute stating the causes that might be invoked in support of the nonretention of a teacher was included in the original education laws and none was enacted until 1957 when S.L.A. 1957, chapter 71, section 2 (now AS 14.20.-170) first stated and defined the causes for nonretention.

The term "immorality" already had a history of use in the education laws of other states and had been construed in the context of its usage to designate a cause for nonretention of a teacher by the highest courts of several states.[38] The broad definition first provided by our legislature, as conduct tending to bring the teacher or his profession into public disgrace or disrespect, is not inconsistent with the broad interpretation given to immorality by the courts of other states and is evidence that our legislature intended that it serve the purpose of a "catch-all" statute for all types of misconduct which would warrant re-

33. 367 P.2d 739, 742 (Alaska 1961), cert. denied, 370 U.S. 916, 82 S.Ct. 1554, 8 L. Ed.2d 498 (1962).

34. 258 U.S. 529, 42 S.Ct. 391, 66 L.Ed. 747 (1922).

35. Story, Const. Sec. 1398.

36. Shwab v. Doyle, 258 U.S. 529, 534, 42 S.Ct. 391, 392, 66 L.Ed. 747, 752 (1922).

37. Section 70 of chapter 97, S.L.A.1929, which established the Territorial school system, stated:

> Certificates may be Revoked. The Commissioner of Education shall have the power to revoke for immorality, violation of written contract, intemperance, crime against the laws of the Territory, or unprofessional conduct, any certificate which may have been grant-

ed; Provided, that no certificate shall be revoked until the accused has been given an opportunity to be heard.

This statute became AS 14.20.090 when Alaska laws were recodified and remained unamended until 1965 when S.L.A.1965, chapter 41, was enacted. The amendment eliminates intemperance, crimes against the laws of the state not involving moral turpitude and unprofessional conduct as statutory causes for revocation of a teaching certificate. It should be noted that upon this redefinition of immorality there is no longer a "catch-all" statutory cause for revocation of a teaching certificate for misconduct which is not a violation of a law or a specific school regulation.

38. See authorities cited notes 14–19 supra and accompanying text.

fusing to renew a teacher's contract.[39] It seems likely that the coverage provided by the original definition was broad because it was intended to be broad, but it is not ambiguous.

On April 19, 1966, present counsel for appellants, who was a member of the Judiciary Committee of the Alaska House of Representatives during the 1965 and 1966 sessions and one of the sponsors of House Bill 25, forwarded to this court a copy of the House Journal for April 12, 1966, containing a House Judiciary Committee Report on Senate Bill 6, which was reported out of committee as House Committee Substitute for Senate Bill 6. The report refers to this court's first opinion in this case construing immorality and to the fact that it now has the case before it again, and states in part that, "this report will be help-

ful to * * * [the court] as an expression of legislative intent that the immorality necessary for nonretention of a teacher is his commission of an act which, under the laws of the state constitutes a crime involving moral turpitude."[40]

The objection to accepting the House Judiciary Committee's effort at construction of the original legislative intent is that it is diametrically opposed to what appears to be the expressed intent of the 1957 legislature when it first defined immorality. The House Journal for that session shows that the House had before it a specific motion which would have adopted as a definition of immorality as a cause for nonretention the following:

(b) 'Immorality' means the commission of any act which involves moral turpitude and which, if committed by any

---

39. See notes 9–19 supra and accompanying text.

40. The report in its entirety read:
REPORTS OF STANDING COMMITTEES
SB The Judiciary Committee has had SEN-
6 ATE BILL NO. 6 (Teachers—conduct of) under consideration and the majority of the committee recommends that it be replaced with HOUSE COMMITTEE SUBSTITUTE FOR SENATE BILL NO. 6, entitled:
"An Act relating to the cause for dismissal or non retention of a teacher; and defining the term 'immorality' when used as a cause."
and that HOUSE COMMITTEE SUBSTITUTE FOR SENATE BILL NO. 6 do pass.
The committee further requests that the following Judiciary Committee report accompanying SENATE BILL NO. 6 be spread in the journal:
"REPORT OF HOUSE JUDICIARY COMMITTEE ON HOUSE COMMITTEE SUBSTITUTE FOR SENATE BILL NO. 6
In Watts and Blue v. Seward School Board, Alaska Supreme Court No. 427, Sept. 1964 [395 P.2d 372], the court construed AS 14.20.170(2) which is amended by HOUSE COMMITTEE SUBSTITUTE FOR SENATE BILL NO. 6. In that case the court held that two teachers, Mr. Watts and Mr. Blue could be discharged because their action in soliciting labor union and fellow teachers for support in removing the school superintendent and

members of the school board from office was an immoral act under Alaska law. The case was taken to the United States Supreme Court (Watts v. Seward School Board Per Curiam No. 923 [381 U.S. 126, 85 S.Ct. 1321, 14 L.Ed.2d 261]) which said: 'We need not consider petitioners' contentions at this time, for since their petition for certiorari was filed, Alaska has amended its statutes governing the dismissal of teachers.' The amendments referred to were chapters 14 and 41, SLA 1965. The state supreme court now has the case before it and HOUSE COMMITTEE SUBSTITUTE FOR SENATE BILL NO. 6 and this report will be helpful to it as an expression of legislative intent that the immorality necessary for nonretention of a teacher is his commission of an act which, under the laws of the state constitutes a crime involving moral turpitude. While the substantive change of HOUSE COMMITTEE SUBSTITUTE FOR SENATE BILL NO. 6 is already embodied in the recently passed HOUSE BILL NO. 12 (Education Code), it is felt that enactment of HOUSE COMMITTEE SUBSTITUTE FOR SENATE BILL NO 6 will make manifest legislative intent as an aid to the court."
The report was signed by Mr. Guess, Chairman, and concurred in by Messrs. Taylor, Tillion, Stevens and Metcalf. Mr. Josephson abstained pursuant to the Uniform Rules of the Legislature.
SENATE BILL NO. 6 was referred to the Rules Committee for placement on the calendar.

citizen generally, would be punishable at law.

Objection was voiced from the floor and the following amendment was offered and unanimously adopted:

Strike sec. (b) and insert '(b) 'Immorality' means conduct tending to bring the individual concerned or the teaching profession into public disgrace.'[41] Subsequently the definition of immorality was again amended to add the words 'or disrespect'.[42]

Since the 1957 legislature was specifically moved to adopt the definition of immorality which would have restricted the term to crimes involving moral turpitude and rejected the motion and unanimously adopted the definition which has heretofore been applied in this case by the administrative bodies and the courts, we find no merit in appellants' argument on this point.[43]

 Last to be considered under this subject is appellants' argument that en-

actment of AS 14.20.095 [44] by the 1965 legislature is a fact which should influence our reconsideration of this case.

We have concluded that this statute can have no controlling effect on the facts of this case.

It cannot be given retrospective effect because there is no express declaration in the statute that it should have this effect.[45] In any event, it is directed at the rules or regulations that the commissioner of education, a local school board or local administrator might promulgate which would restrict or modify the right of a teacher to criticize public education officials outside school hours. In the case before us it is an act of the legislature itself that is being construed with relation to appellants' conduct. The new statute applies to activities conducted outside school hours,. whereas much of the conduct condemned in this case occurred during school hours. The statute in no way condones the circulation to the public of false criticism of

41. House Journal 1957, at 336 reads in pertinent part:

The House was called to order.
Mr. Metcalf offered the following amendment to C.S. HOUSE BILL NO. 33.

 * * * * *

Mr. Metcalf then offered the following amendment:
Page 2, Line 7: After the word 'be' delete everything down to and including semicolon on line 15 and substitute in lieu thereof the following:
limited to and based on 'Incompetence' and 'Immorality', which are defined as follows:
(a) 'Incompetency' means the unintentional or intentional failure or omission to perform one's legitimate duties in a satisfactory manner with respect to one's present position.

(b) 'Immorality' means the commission of any act which involves moral turpitude and which, if committed by any citizen generally, would be punishable by law.
Mr. Metcalf moved and asked unanimous consent that the amendment be adopted. Seconded by Mrs. Fischer. Mr. Coghill objected.

Mr. Buckalew then offered the following amendment to the amendment:

Strike sec. (b) and insert '(b) 'Immorality' means conduct tending to bring the individual concerned or the teaching profession into public disgrace.'
Mr. Buckalew moved and asked unanimous consent that the amendment to the amendment be adopted. There being no objection the amendment to the amendment was ordered adopted.

42. House Journal 1957, at 404.

43. On the subject of construing legislative intent under these and similar circumstances see: Nichols v. School Dist. No.. 3, 87 Mont. 181, 287 P. 624, 626 (1930); Rural Independent School Dist. No. Ten v. New Independent School Dist., 120 Iowa 119, 94 N.W. 284, 286–287 (1903); 1 Sutherland, Statutory Construction § 1931 (3 ed. 1943).
We have also considered Watts, Watts & Co. v. Unione Austriaca Di Navigazione, 248 U.S. 9, 21, 39 S.Ct. 1, 63 L.Ed. 100, 101 (1918) and Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 541–42, 61 S.Ct. 347, 85 L.Ed. 327, 329 (1941) and find the doctrine of those cases with respect to applying supervening changes in law to be inapplicable to this case.

44. Quoted note 4 supra.

45. AS 01.10.090.

public education officials. In signing AS 14.20.095 into law the Governor commented:

> In brief, this bill does protect teachers who criticize others from being dismissed on the ground that they have violated a school regulation. But it does not protect a teacher from dismissal on the ground of 'immorality', as occurred in the Watts case. The bill might well mislead some into believing that no adverse results would follow from defamation of school or public officials. This would be a false and dangerous assumption.[46]

Last to be considered is the question of whether any of the Board's conclusions, affirmed herein, infringe on appellants' rights to freedom of speech under the First Amendment to the United States Constitution.

There is no constitutional question associated with the Board's conclusion that publication and circulation of the Open Letter to the general public was substantial noncompliance with Board Regulation E(7), which required that "grievances, complaints and communications" be submitted to the Board through the Superintendent.[47]

With respect to the other questions presented, appellants urge that we consider the applicability of New York Times Co. v. Sullivan,[48] Garrison v. State of Louisiana,[49] and Dombrowski v. Pfister,[50] since these decisions had not been published in time to have been briefed and considered prior to the issuance of our Opinion No. 251.

In *New York Times,* a public official was prosecuting a suit for libel for money damages against the newspaper because of criticism of his official conduct published in a paid advertisement containing false statements. In *Garrison* a district attorney was appealing a conviction of criminal defamation for criticism directed at state judges. The facts and purposes involved in the above cases are considerably different from those now before us. Here the appellants were not being prosecuted, civilly or criminally, by the public official against whom the false statements were directed. The Seward School Board was simply exercising its right under state law to refuse to renew appellants' teaching contracts for an additional year for conduct which it found brought public disgrace and disrespect upon appellants and the teaching profession generally. In placing *New York Times Co.* and *Garrison* in perspective, the Court said at 379 U.S. at 75, 85 S.Ct. at 216, 13 L.Ed.2d at 133:

> Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.

 There is no question but that appellants had a constitutional right to compile, reproduce and distribute the Open Letter, even though it did contain false statements concerning the Superintendent.[51]

> The true liberty of the press is amply secured by permitting every man to publish his opinion; but it is due to the peace and dignity of society to inquire into the motives of such publications, and to distinguish between those which are meant for use and reformation * * * and those which are intended merely to delude and defame. To the latter description, it is impossible that any good government should afford protection and impunity.

In Commonwealth v. Blanding, 3 Pick. 304, 15 Am.Dec. 214, 218 (Mass.1825) the court said, in interpreting this constitutional right:

> The liberty of the press was to be unrestrained but he who used it was to be

46. Legislative Reporting Service, Report Number 12, p. 141 (1965).

47. See text pp. 599–601 supra.

48. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

49. 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

50. 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

51. This concept of the constitutional right was judicially expressed in 1788 in Respublica v. Oswald, 1 Dall. 319, 1 L.Ed. 155, 159, 1 Am.Dec. 246, which was decided at the time the states were in the process of ratifying the constitution. The court said:

But this does not mean that they cannot be held appropriately accountable where their acts wrongfully damage their own and another's professional prestige, reflect detrimentally on the teaching profession as a whole and result in a loss of respect by the public for appellants and the local school system. The production and distribution of the Open Letter was a time consuming and deliberate act. The false statements contained in it were not made in heated debate. The factual basis for the charges could have been verified by appellants if they had taken the time to do so. Appellants admittedly ignored established democratic procedure for obtaining redress. Instead, they attempted to arouse and inflame the public against the Superintendent and the School Board on charges which were largely untrue. They chose to attempt to substitute the mass meeting for the orderly process of hearing and appeal. Under these facts we must hold that, considering the nature of their employment, appellants exceeded the limits of the exercise of their right of freedom of speech to the extent that they were not entitled to require the Seward School Board to renew their teaching contracts under the tenure law.

Appellant Watts had a constitutional right to freedom of discussion with other teachers, but he did not have a constitutional right to have his teaching contract renewed after soliciting teachers on school premises, during school hours, to support a private move to oust the Superintendent, where the effect of these acts was to bring down public disgrace and disrespect on him and his profession and to undermine the morale and discipline of the local school system.

Again, there is no doubt but that appellant Blue had the right to address the meeting of longshoremen and state that "we have been unable to get rid of the Superintendent, so we are going to get rid of the Board". And, when considered as an isolated act, separate and apart from the other events in which he took part in Seward during May and June of 1959, it would no doubt be said that no disgrace or disrespect could have resulted. However, when considered in the light of the entire record —that is, in relation to all of Blue's activities and all of the happenings during the times involved, the Board's conclusion can be sustained.[52] On the other hand, the constitutional question becomes a close one which should be resolved in appellants' favor in view of the fact that the record contains no evidence that false or misleading statements were made, in fact, contains no evidence of anything that was said at the meeting except the statement under consideration and that the speech was not made on school premises during school hours.

responsible in case of its abuse; like the right to keep firearms, which does not protect him who uses them for annoyance or destruction.

In Patterson v. State of Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879, 881 (1907), Justice Holmes cited the above cases as authority for stating:

In the first place, the main purpose of such constitutional provisions is 'to prevent all such *previous restraints* upon publications as had been practised by other governments,' and they do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare. (Citing cases.) The *preliminary freedom extends as well to the false as to the true; the subsequent punishment may extend as well to the true as to. the false.*

See Near v. State of Minnesota, 283 U. S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1930)

where the Court cited with approval the above quoted portion of Patterson v. State of Colorado in holding that prior restraint against the press could not be exercised, but that the publisher would be held liable for publications which abused the privilege. The Court in Near also noted the exception to the general rule which has been held to apply in times of war citing Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919). (Actually, the constitutional right of freedom of speech seems to consist basically of the right to utter and print words. The ideas or thoughts expressed by those words are only considered in hindsight to determine whether or not the utterer abused his constitutional privilege.)

52. See discussion in text pp. 595–596 supra.

We have been unable to find any application of the rule of Dombrowski v. Pfister [53] to the facts of this case.

More in point is Adler v. Board of Education [54] where the Supreme Court of the United States held that a New York statute permitting the Board of Regents, after hearing, to announce the organizations which it found advocated overthrow of the government by force or violence, and to provide by regulation that membership of a teacher in such an organization was prima facie evidence of disqualification, did not violate the constitutional rights of freedom of speech. In discussing Garner v. Los Angeles Bd. of Pub. Works [55] where the Court held that a municipal employer was not prevented, because of being an agency of the state, from inquiring of its employees as to matters that may prove relevant to their fitness and suitability for public service, the Court in *Adler* said:

A teacher works in a sensitive area in a school room. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted.[56]

The Court went on to state at 342 U.S. at 493, 72 S.Ct. at 385, 96 L.Ed. at 525 that a teacher who was disqualified from employment under the statute was not thereby denied the right of free speech and assembly —that his freedom of choice between membership in the organization and employment in the school system might be limited, but not his freedom of speech or assembly, except in the remote sense that limitation is inherent in every choice.

We find no merit in appellants' contention that AS 14.20.170(a) (2), defining immorality as conduct tending to bring disgrace or disrespect upon the teacher or his profession, was unconstitutional for vagueness.

Controlling on this point is Beilan v. Board of Education [57] where the Court stated:

We find no requirement in the Federal Constitution that a teacher's classroom conduct be the sole basis for determining his fitness. Fitness for teaching depends on a broad range of factors. The Pennsylvania tenure provision specifies several disqualifying grounds, including immorality, intemperance, cruelty, mental derangement and persistent and willful violation of the school laws, as well as 'incompetency.'

The Court's comments on and approval of the use in statutes of broad "catch-all" phrases to describe a teacher's conduct are quoted supra at page 590.

In Board of Education of City of Los Angeles v. Swan [58] the court held that the phrase "unprofessional conduct" was not void for vagueness. At 261 P.2d at 266 the court said:

As was said in the Goldsmith case, 66 Cal.App. at page 168, 225 P. at page 787: '* * * the calling [of a teacher] is so intimate, its duties so delicate, the things in which a teacher might prove unworthy or would fail are so numerous, that they are incapable of enumeration in any legislative enactment. * * * [the] teacher is intrusted with the custody of children and their high preparation for useful life. His habits, his speech, his good name, his cleanliness, the wisdom and propriety of his unofficial utterances, his associations, all are in-

53. 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

54. 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952).

55. 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317 (1951).

56. 342 U.S. at 493, 72 S.Ct. at 385, 96 L. Ed. at 524.

57. 357 U.S. 399, 406, 78 S.Ct. 1317, 1322, 2 L.Ed.2d 1414, 1420 (1958).

58. 41 Cal.2d 546, 261 P.2d 261 (1953), cert. denied, 347 U.S. 937, 74 S.Ct. 627, 98 L.Ed. 1087 (1954).

volved. His ability to inspire children and to govern them, his power as a teacher, and the character for which he stands are matters of major concern in a teacher's selection and retention. How can all of these things be provided for and *offenses against them be particularly specified in a single statute*? It was further said, 66 Cal.App. at page 172, 225 P. at page 789: 'No one has a natural or inherent right to teach a public school' and the Legislature 'for reasons of public policy' may 'make the right to teach in any particular school subject to a broad discretion in the school authorities to dismiss for causes which come within very general designations.' (Emphasis added.)

We have considered the views of our dissenting colleague.[59] It is our view that our colleague could only arrive at the conclusions recommended with respect to the conduct of appellant Watts and the violation of Regulation E(7) by emphasizing portions of the testimony of individual witnesses, given on cross-examination, to the exclusion of the over-all testimony of numerous witnesses and reversing the findings and conclusions of the Seward School Board which had observed each witness individually and had made its findings on substantial evidence.

It is argued that the majority should not have reconsidered the trial court's order with respect to the circulation of the Open Letter. This view must be considered in the light of the fact that appellants specifically requested that the case be considered de novo and that appellee requested that the validity of Regulation E(7) and its violation be passed upon. In order to reconsider the case in its entirety the record was ordered supplemented by the transcripts of all board proceedings. As our colleague points out in his opinion, (footnote 25) under the circumstances this court is free to consider any undetermined issues as well as to alter a previous determination of law "in regard to the proper construction and permissible reach of AS 14.20.170(a)(2)'s 'immorality' as a grounds for nonretention." We do not consider that the authorities cited by our colleague have been superceded.

Our colleague seems to be of the view that this court's original interpretation of "immorality" was incorrect because of the United States Supreme Court's mandate and the authorities cited.

The authorities cited in footnote 25 of the dissent represent instances where the United States Supreme Court disagreed with the construction of the state court and *reversed* and remanded the case for "further proceedings not inconsistent" with that Court's views. Here, our interpretation of the meaning of immorality, pursuant to AS 14.20.170(a)(2), was not reversed. The United States Supreme Court did not express any view of its own with respect to the meaning of that term. It vacated the judgment and remanded the case to this court for further consideration in view of the fact that there had been changes in certain Alaska statutes since publication of our decision.

In this connection it should be mentioned that the Supreme Court's original per curiam opinion of May 3, 1965, 381 U.S. 126, 85 S.Ct. 1321, stated that subsequently enacted legislation in Alaska had changed the definition of immorality *as grounds for dismissal* to "the commission of an act which, under the laws of the state, constitutes a crime involving moral turpitude". This, of course, was not the case. The legislation which was enacted was the provision defining "immorality" as a ground for *revocation of a teaching certificate* in AS 14.20.090, where no definition of "immorality" had previously been provided.[60]

59. It is established procedure in this court, where the interests of clarification and finality may be served, for the majority opinion to comment briefly on the views advanced by a dissenting opinion, which has already had the opportunity of commenting on the views of the majority.

60. This aspect of the case is discussed on p. 602 of this opinion.

When this discrepancy was drawn to its attention the United States Supreme Court issued its corrected per curiam opinion which accurately reflected the above fact. The point is that at the time the case was remanded the United States Supreme Court was obviously not aware of the fact that the statute which had been amended was one that was not directly involved in this case.

This court, therefore, is not under a mandate from the United States Supreme Court to revise its interpretation of "immorality" to conform to some view expressed by that Court because no view has been expressed. This court is only under a mandate to reconsider its interpretation in the light of subsequently enacted legislation in Alaska, which has been done.

We agree with all of the law and philosophy contained in the various quotes on freedom of speech cited in our colleague's opinion, but do not believe they are applicable to the facts before us.

It is therefore ordered:

(1) That the Seward School Board's conclusion that appellants were guilty of substantial noncompliance with Board Regulation E(7) is affirmed as a separate and independent cause for their nonretention.

(2) That the Seward School Board's original conclusion that appellants were guilty of immorality within the meaning of the statute as it then defined that term, for their part in compiling, reproducing and distributing the Open Letter containing false statements disparaging of the Superintendent is affirmed as a cause for their nonretention.

(3) That the Seward School Board's conclusion that appellant Watts was guilty of immorality, as it was then defined by statute, for his activities in soliciting teachers to join in a private move to oust the Superintendent is affirmed as a cause for his nonretention.

(4) That the Seward School Board's conclusion that appellant Blue's speech to the longshoremen's union constituted immorality, as it was then defined by statute, is set aside for not being supported by substantial evidence.

RABINOWITZ, Justice (dissenting in part, concurring in part).

I concur in the majority's conclusion that appellant Blue's talk to the Seward longshoremen was not immoral conduct. I dissent from the majority's determination that appellant Watts' solicitation of his fellow teachers, the Framptons, constituted immorality; from the decision that both appellants "were guilty of immorality * * * for their part in compiling, reproducing and distributing the Open Letter"; and I also dissent from the majority's holding that appellants "were guilty of substantial noncompliance with Board Regulation E(7)."

AS TO APPELLANTS' IMMORALITY IN THE COMPILATION, REPRODUCTION AND DISTRIBUTION OF THE MAY 18, 1959, OPEN LETTER

In the March 1960 bills of particulars accompanying the notices of nonretention which were sent by the Seward School Board, appellants were in part charged with having engaged in "acts of immorality which have tended to bring * * * [appellants] and the teaching profession into public disgrace and disrespect." As to the May 18, 1959, Open Letter, it was particularized that appellants had

assisted in the printing and distribution of false, distorted and misleading statements in a 'Bill of Particulars' against the Superintendent of the Seward Public Schools, with the intent of injuring the professional standing of the Superintendent and destroying community and pupil confidence in the administration of the schools. Such statements contained in this Bill of Particulars tended to destroy community confidence in the management of school affairs by the School Board.

This 'Bill of Particulars' was circulated during 1959 in the community of Seward.[1]

When the matter was before the superior court in December 1961 on appellants' initial petition for review, Judge James M. Fitzgerald held in part that:

> [A]s a matter of law, the circulation by the petitioners of the Open Letter to the Seward School Board under date of May 18, 1959, is not immoral conduct within the meaning of the statute. I also conclude that, as a matter of law, the circulation of a petition seeking the recall of members of the Seward School Board is not immoral conduct within the meaning of the statute.[2]

The case was then remanded to the Appeals Committee of the State Board of Education for additional findings of fact and conclusions of law. After this was accomplished, appellants again sought review in the superior court and in September 1963, Judge Hubert A. Gilbert denied appellants' second petition for review. Appellants then appealed to this court from the denial of their second petition for review.

It is of particular significance that appellees failed to cross-appeal from Judge Fitzgerald's holding that as a matter of law

appellants' actions in regard to the Open Letter and recall petition did not constitute immoral conduct. None of the briefs which were initially presented to this court made any reference to these rulings in regard to the Open Letter and recall petition.[3]

After the United States Supreme Court vacated the judgment which had been entered in Watts v. Seward School Bd.[4] and had remanded the case,[5] this court requested further briefs. In none of the additional briefs, which were thereafter filed, was issue made of Judge Fitzgerald's 1961 ruling that appellants were not guilty of immoral conduct resulting from any part they played in authoring, reproducing, and circulating the Open Letter of May 28, 1959.[6]

Thus, without any attempt to distinguish this court's prior precedents, and without the benefit of an adversary presentation (i.e., statement of points, specification of errors, and arguments in appellate briefs), the majority has unilaterally decided to reverse Judge Fitzgerald's holding as to the Open Letter. It is interesting that the majority isolates the Open Letter for this singular appellate treatment without attempting any reference to the superior

1. The quote is from the bill of particulars which was sent to appellant Blue. The substance of the pertinent part of the bill of particulars which appellant Watts received is the same.

2. In his oral opinion pertaining to this issue, Judge Fitzgerald said:
 This definition agrees generally with that adopted by the * * * [Supreme Court of Oklahoma] in Warkentin vs. Kleinwachter [166 Okl. 218], 27 P.2d 160. That court found immoral conduct to be that conduct which is willful, flagrant, or shameless, and which shows a moral indifference to the opinion of the good and respectable members of the community. Judged in the light of these standards, the circulation of the open letter to the Seward School Board, under date of May 18, 1959, is not immoral conduct; nor is circulating a petition seeking the recall of members of a school board immoral conduct within the meaning of the statute. This is not to say that the con-

duct of the petitioners may not be cause for non-retention under other provisions of the statute.
 Note that the bills of particulars which accompanied the notices of nonretention also specified that appellants were guilty of immoral acts because while teachers in the Seward Public Schools, [they] carried to the people of the community and personally signed a petition seeking a recall of the Seward School Board on charges that could not be substantiated and which were false.

3. See the brief filed with this court prior to our initial decision in Watts v. Seward School Bd., 395 P.2d 372 (Alaska 1964).

4. Ibid.

5. Watts v. Seward School Bd., 381 U.S. 126, 85 S.Ct. 1321, 14 L.Ed.2d 261 (1965).

6. Similarly no issue is made of Judge Fitzgerald's holding that appellants' circularization and adherence to the petition for recall of the Seward School Board was not immoral conduct as a matter of law.

court's decision in regard to the petition for recall.

In Theodore v. Zurich Gen. Acc. & Liab. Ins. Co.,[7] this court said:

If Zurich had felt that that decision was erroneous, it might have taken a cross-appeal to this court. But it failed to do so, and it thus waived its objection that service of process was improper or insufficient.[8]

Four years later in Alaska Brick Co. v. McCoy,[9] the *Zurich* rule was again adhered to. At page 457, this court stated: Appellee did not take a cross appeal. Nor did he even file a cross statement of points in appellant's appeal, which at least would have alerted appellant to the existence of the issue as to attorney's fees so that additional portions of the record might have been designated if appropriate. Orderly procedure will not permit an appellee to attack a judgment for the first time in his brief in the appellant's appeal. We shall not pass upon the matter as to the attorney's fees allowed by the trial court.

See also the following authorities which have reached similar conclusions as to the necessity of perfecting cross-appeals. Arkansas Fuel Oil Co. v. Leisk, 133 F.2d 79 (5th Cir. 1943); Cochran v. M & M Transp. Co., 110 F.2d 519 (1st Cir. 1940); United States v. Bentley, 107 F.2d 382 (2d Cir. 1939); Smith v. Boise City, 104 F.2d 933 (9th Cir. 1939).

In determining to reverse the superior court on this point, the majority not only has disregarded the holdings of *Zurich* and *Alaska Brick* but by virtue of its reversal has assigned to limbo a vast body of this court's prior literature, including that portion of this court's original opinion in

Watts v. Seward School Bd.[10] where it was said:

The appellants voiced a broad and general claim in their brief on appeal that their constitutionl rights to assemble and speak freely have been abridged in this case and that they have been deprived of their personal liberties and property rights without due process of law. They treat the subject in a very cursory fashion and cite us to no case law in support of their claim. Under these circumstances we need not consider the point.[11]

In addition to *Watts,* the decisions of this court are relatively legion in which issues were not resolved because of the parties' failure to raise proper objections in the trial court, or because of improper statements of points on appeal, or because of improper specifications of error, or due to the lack of adequate treatment of specific issues in their appellate briefs. See: Sanuita v. Common Laborer's & Hod Carriers Union, 402 P.2d 199 (Alaska 1965); Meyst v. East Fifth Ave. Serv., 401 P.2d 430 (Alaska 1965); Alaska Brick Co. v. McCoy, 400 P.2d 454 (Alaska 1965); Alaska State Housing Authority v. Vincent, 396 P.2d 531 (Alaska 1964); Merl F. Thomas Sons, Inc. v. State, 396 P.2d 76 (Alaska 1964); Williams v. DeLay, 395 P.2d 839 (Alaska 1964); Apex Concrete Co. v. Bray, 395 P.2d 514 (Alaska 1964); Buza v. Columbia Lumber Co., 395 P.2d 511 (Alaska 1964); Saxton v. Harris, 395 P.2d 71 (Alaska 1964); Orbeck v. Wheeler Constr. Co., 394 P.2d 781 (Alaska 1964); Higgins v. Lantz, 394 P.2d 776 (Alaska 1964); Preferred Gen. Agency, Inc. v. Raffetto, 391 P.2d 951 (Alaska 1964); Thomson v. Wheeler Constr. Co., 385 P.2d 111 (Alaska 1963); Freightways Ter-

---

7. 364 P.2d 51, 57 (Alaska 1961).

8. In support of this holding this court cited Western Life Indem. Co. of Illinois v. Rupp, 235 U.S. 261, 271, 35 S.Ct. 37, 59 L.Ed. 220, 224 (1914); Alaska Industrial Bd. v. Chugach Elec. Ass'n, 356 U.S. 320, 324–325, 78 S.Ct. 735, 2 L.Ed.2d 785, 798 (1950).

9. 400 P.2d 454, 457 (Alaska 1965).

10. 395 P.2d 372, 376 (Alaska 1964).

11. Accord, Sanuita v. Common Laborer's & Hod Carriers Union, 402 P.2d 199, 203 (Alaska 1965).

minal Co. v. Industrial & Commercial Constr., Inc., 381 P.2d 977 (Alaska 1963); Gregory v. Padilla, 379 P.2d 951 (Alaska 1963); Pollastrine v. Severance, 375 P.2d 528 (Alaska 1962); Parks v. Brown, 368 P.2d 220 (Alaska 1962); Veal v. Newlin, 367 P.2d 155 (Alaska 1961); Bidwell v. Scheele, 355 P.2d 584 (Alaska 1960).

On the basis of the holdings in Theodore v. Zurich Gen. Acc. & Liab. Ins. Co.[12] and Alaska Brick Co. v. McCoy[13] and the above sampling of authorities, and in light of the fact that appellees never cross-appealed from the superior court's holding that appellants' part in writing, reproducing and distributing the Open Letter was not immoral conduct, I am of the opinion that this issue is not properly before us and that Judge Fitzerald's decision on this point should therefore remain undisturbed. In my view it was inappropriate for the majority to have decided an issue of such importance without the benefit of an adversary presentation and. in circumstances which have denied appellants any opportunity to argue this question.[14]

AS TO APPELLANT WATTS' IMMORALITY ARISING FROM "HIS ACTIVITIES IN SOLICITING TEACHERS TO JOIN IN A PRIVATE MOVE TO OUST THE SUPERINTENDENT"

The majority has concluded that appellant Watts' conduct in soliciting the Framptons is within AS 14.20.170(a) (2)'s definition of immorality as a cause for nonretention. I think it appropriate to again point out that this statute, before amendment, had defined immorality as

conduct of the person tending to bring the individual concerned or the teaching profession into public disgrace or disrespect * * *.

At the second hearing before the Seward School Board, Benjamin Frampton testified that on April 28, 1959, he

went with Mr. Watts down to Mrs. Frampton's room and there he stated that he had been sent as a representative of the group * * * he had been a friend of ours for a long time. He wanted to know if we would go along with the movement to oust Mr. Fabricius. He stated that he knew the certification of teachers is not the real issue. He said he knew I was in the middle and didn't want me to get hurt. He said that they were quite sure they could get Mr. Fabricius and wanted to know if we would go along with them. We told him at that time that we could see no reason why anyone should try to get Mr. Fabricius and we considered he was doing all right and would have take [sic] the stand of Mr. Frabricius and the school board. Then we asked Mr. Watts what group was going along with him. Then he said under the circumstances he would rather not say. I believe that was the conversation.[15]

The foregoing is the sum total of Watts' immoral conduct in regard to the Frampton solicitation. The record further establishes that the only persons present during this entire conversation were Mr. and Mrs. Frampton and appellant Watts. It is undisputed that this conversation took place in Mrs. Frampton's classroom. As to the time of the conversation Mr. Frampton testified that:

It was April 28, 1959 before school, that morning.

* * * * * *.

I can't say definitely, I imagine it was somewhere between 8:30 and 9:00 however.

---

12. 364 P.2d 51 (Alaska 1961).

13. 400 P.2d 454 (Alaska 1965).

14. Further reference will be made to the May 18, 1959, Open Letter in conjunction with discussion of other issues.

15. Mrs. Frampton's version of this conversation was the same with the exception that she testified that she said she would not join and "I asked, what has Mr. Fabricius done to deserve such a thing as this? He didn't come up with an answer."

Mr. Frampton was then asked whether in his "experience as a teacher and a principal in the Seward public school system," the period between 8:30 and 9:00 was "during school hours for a teacher." The witness then testified "According to our regulations it would have been". Subsequently, on cross-examination, Mr. Frampton testified that the conversation with appellant Watts took place before school that morning, and also testified "It's possible I couldn't say" that the conversation with Watts took place prior to 8:30 a. m.[16] In any event, the Seward School Board made no finding as to the time this conversation took place. Yet on the state of this, at best, equivocal record the majority apparently lays great stress on the fact that this conversation took place "during school hours." More particularly, the majority concluded that Watts' conduct in soliciting the Framptons

> on school premises, during school hours, to join in a private movement to attempt to oust Superintendent Fabricius was immoral conduct within the statutory definition.

Assuming the Framptons' version of the April 28, 1959, conversation is accurate, I fail to ascertain how this conversation among three teachers (before any school children were present) can be characterized as conduct which tended to bring the individual concerned or the teaching profession into *public* disgrace or disrespect. Taking the majority's definition of immorality as the applicable standard, I am of the opinion that Watts' contribution to the questioned conversation was not immoral conduct as a matter of law.

Precisely what concrete meaning is to be given to the statutory definition of immorality set forth in AS 14.20.170(a) (2) is never made clear by the majority. The

authorities relied upon by the majority all define immorality in terms of conduct which is offensive to the community's morals or inconsistent with moral rectitude.[17] Appeal of Schneider,[18] also relied upon by the majority, stated that the synonyms of "immorality" are "corrupt", "indecedent", "depraved", and "dissolute." Yet, after discussing these authorities, the majority concludes that "For the purposes of this case we must accept * * * the legislative definition provided." The opinion does indicate that the standard for determining immorality is "one of degree depending upon the rules of society and to some extent upon the mores of the particular community."

The majority's conclusion that Watts' conversation with the Framptons was tantamount to immoral conduct is apparently based on three grounds. First, it was reasoned that the objective (ouster of the superintendent) was not recognized by the Seward District Teachers Association. As to this ground, we are not informed if this same conversation would be held moral if the Teachers' Association had as one of its objectives the removal of the superintendent. Secondly, the majority reasons that since "orderly", "honorable", and "democratic" regulations were available for removal of the superintendent, Watts' conversation with the Framptons was therefore immoral. I take this statement to mean that any violation of a school board regulation is equatable to immoral conduct. Thirdly, "when all of the facts became known" (note it is not stated what method of revelation is relevant or the pertinent scope of such revelation) Watts' conversation "during school hours on school premises, were degrading, unprofessional, and detrimental to morale and discipline and could only result in loss of respect by the public for him and his pro-

---

16. Watts flatly denied Framptons' version of the April 28, 1959, conversation. He also testified that the talking in question took place before school had started.

17. Appeal of Batrus, 148 Pa.Super. 587, 26 A.2d 121 (1942); Negrich v. Dade

County Bd. of Pub. Instruction, 143 So. 2d 498 (Fla.App.1962).

18. 12 N.J.Super. 449, 79 A.2d 865 (App. Div.1951).

'fession." As to this conclusion, the majority does not disclose which rules of society, or mores of a given community, compelled such characterizations. Similarly the reader is not informed if any one of these three categories in and of itself is sufficient to metamorphize Watts' conversation into immoral speech.

As pointed out earlier, what occurred was a conversation among three adults, in the absence of any school children. After Watts made known his purpose, the Framptons unequivocally rejected Watts' request to join the movement and then and there articulated their support of the superintendent. To characterize Watts' conduct, "corrupt", "indecent", "depraved", or "dissolute" is simply not borne out by the record. For the majority to conclude that Watts' conversation was "degrading", "unprofessional", "detrimental to morale and discipline" and resulted in loss of respect by the public is equally devoid of any substantiation in the record and appears to be the product of considerable speculation.

In short, assuming the truth of all the facts relied upon by the majority, and taking as the applicable standard their adoption of the literal statutory definition of immorality, I am of the opinion that appellant's conversation with the Framptons did not tend to bring him or his profession into public disgrace or disrespect. Here all that was involved was speech directed toward requesting help in bringing about a change in school administration.

AS TO THE HOLDING THAT APPEL-
LANTS' FAILURE TO COMPLY
WITH REGULATION E–7 OF THE
SEWARD SCHOOL BOARD "WAS
A SUFFICIENT INDEPENDENT
CAUSE FOR THEIR NONRETEN-
TION"

I cannot agree with the conclusion that appellants' circulation of the Open Letter amounted to "substantial noncompliance" with the Board's regulations.[19]

Regulation E–7 of section I of the Seward School Board provides:

Grievances, complaints and communications from employees shall be submitted to the Board through the Superintendent. Any employee or group of employees may at any time appeal to the Board.

Regulation E–9 of the Board's regulations reads:

Employees or groups of employees desiring to address the Board shall address their communication to the Superintendent and not to individual members of the Board, except that copies of any communication may be sent to all Board members.

Also pertinent is the finding of the Seward School Board that "the Open Letter to the Seward School Board was delivered to Superintendent George Fabricius at substantially the same time it was delivered to members of the School Board."

The record demonstrates that Superintendent Fabricius (the author of the regulations in question) had considerable difficulty explaining the instances where either regulation E–7 or regulation E–9 was applicable. He encountered similar problems in defining the relationship between these two regulations. At one point in his testimony, Superintendent Fabricius was asked:

Mr. Walton: Let's take the other regulations—assuming this is a regulation of the Board. Sub-paragraph 7—that states that grievances, complaints, and communications shall be submitted to the Board through the Superintendent. Do I understand you to state that in your opinion, as the one who drafted this regulation, that paragraph is qualified by Paragraph 9, which says it's OK to do it to the Board simultaneously.

Mr. Fabricius: Well, if you back to the other paragraph, it states there, it's stated in there—my interpretation of

19. AS 14.20.170(a) (3) provides that a cause for nonretention of a teacher is substantial noncompliance with the school laws of the state, the regulations or bylaws of the department, the bylaws of the district, or the written rules of the superintendent.

it would be that it should be to the Superintendent, but it doesn't prevent you from at the same time sending it to the Board.[20]

A comparison of the text of Regulation E-7 with Regulation E-9 illuminates the uncertainties and ambiguities inherent in the Board's regulations regarding the proper procedure to be followed by its employees in addressing grievances, complaints, and communications to the Board. On this basis alone I would reverse the Board's finding that appellants were guilty of substantial noncompliance with Regulation E-7. The applicability of, and relationship between, the two regulations is at best uncertain. I find it unreasonable to conclude that appellants had failed to substantially comply with Regulation E-7 when the evidence shows that they had complied with the provisions of Regulation E-9; that the regulations themselves were ambiguous, and that contemporaneous interpretation of these two regulations by the Superintendent and the Seward School Board was to the effect that substantially simultaneous notification to the Board and the superintendent was sufficient compliance with Regulation E-7.[21]

Two other factors also lead me to differ with the majority's holding in regard to Regulation E-7. First, there is nothing in the text of Regulation E-7 which prohibits an employee from making a public disclosure of any grievance, complaint, or communication which he has submitted to the Board, and as is pointed out subsequently, education, and in partic-

ular administration of our schools, is a public issue as to which freedom of discussion is essential to the formation of public opinion. Secondly, in the crucial period during the weeks prior to the circulation of the Open Letter, the Seward School Board and the Superintendent had met with committees of the Seward District Teachers' Association in regard to grievances pertaining to the nonretention of certain teachers. At no time during this period did either the Seward School Board or the Superintendent require compliance with Regulation E-7 as a procedural prerequisite to the Board's receiving and hearing grievances, complaints, or communications from individuals.

In such circumstances I believe it to be basically unjust to hold appellants to the letter of Regulation E-7 which is ambiguous when read in conjunction with Regulation E-9 and one that had been, in practice, consistently disregarded by the Board during the period of time immediately preceding appellants' circulation of the Open Letter.

## AS TO LEGISLATION ENACTED BY THE ALASKA LEGISLATURE SUBSEQUENT TO THE PUBLICATION OF THIS COURT'S OPINION IN WATTS v. SEWARD SCHOOL BOARD

In petitioning the United States Supreme Court for certiorari, appellants asserted that their dismissals for allegedly immoral conduct unconstitutionally infringed upon "their rights to political expression guaranteed by the First and Fourteenth Amendments of the United States Constitution."

20. Later Mr. Fabricius also testified "The Board might interpret that different than I do. They are the ones to decide."

21. At one point when questioned about a meeting which took place a few weeks prior to the sending of the Open Letter, the following transpired:

Mr. Walton: Sir, do you believe that the Executive committee, of the SD TA, or the members representing it, violated the same regulations when it first approached the Board with respect to non-retention of these four teachers?

Mr. Fabricius: Well I believe they— I recall testimony which shows that they sent me a letter at the same time.
Mr. Walton: Is that what E7 provides for?
Mr. Fabricius: Well, That would be one way of providing for it.
Mr. Walton: Doesn't it say that all grievances shall be submitted to the Board through the Superintendent?
Mr. Fabricius: I believe if you go further along you will see that they may at the same time be sent to members of the Board.

After observing that subsequent to the time appellants had filed their petition for certiorari, the Alaska legislature had passed S.L.A.1965, chapters 14 and 41, which acts redefined "immorality" as a ground for the revocation of a teacher's certificate and added a new section pertaining to the right of teachers to engage in comment and criticism as to school matters outside of school hours, the Supreme Court of the United States stated:[22]

We need not consider petitioners' contentions at this time * * *.

\* \* \* · \* \* \*

This Court has held that supervening changes in state law that may be relevant to the disposition of a case may require that the cause be remanded for appropriate action by the state court. See, e. g., State of Missouri ex rel. Wabash R. Co. v. Public Service Comm'n, 273 U.S. 126, 131, 47 S.Ct. 311, 313, 71 L.Ed. 575, 577. Cf. Trunkline Gas Co. v. Hardin County, 375 U.S. 8, 84 S.Ct. 49, 11 L.Ed.

2d 38. Accordingly, it is appropriate to allow the Alaska court to consider the effect of the new Alaska statutes upon this case.[23]

The Supreme Court of the United States' mandate remanded the case to this court

in order that such proceedings may be had in the said cause, in conformity with the judgment of this Court above stated, as accord with right and justice, and the Constitution and laws of the United States.

Under this mandate this court was required to "consider the effect of the new Alaska statutes upon this case."[24] But this is not the full limit of our authority under this remand.[25] This court is free to consider, if necessary, any undetermined issues. (such as the regulations issue) as well as to alter its previous determination of law in regard to the proper construction and permissible reach of AS 14.20.170(a) (2)'s "immorality" as a grounds for nonretention.[26]

22. AS 14.20.090(2) (SLA1965, ch. 41, § 1) defined immorality for purposes of revocation
 as the commission of an act which, under the laws of the state, constitutes a crime involving moral turpitude.
 AS 14.20.095 (SLA1965, ch. 14) added a new section to our education laws. This act provides:
 *Right to Comment and Criticize Not to be Restricted.* No rule or regulation of the commissioner of education, a local school board, or local school administrator may restrict or modify the right of a teacher to engage in comment and criticism outside school hours, relative to school administrators, members of the governing body of any school or school district, any other public official, or any school employee, to the same extent that any private individual may exercise the right.

23. Watts v. Seward School Bd., 381 U.S. 126, 127, 85 S.Ct. 1321, 1322, 14 L.Ed.2d 261, 262 (1965).

24. As has been pointed out, while the case was pending before this court, on remand, the Alaska legislature amended AS 14.20.-170(a)'s definition of immorality (S.L.A. 1966, ch. 104). Immorality for purposes of nonretention is now defined as

the commission of an act which, under the laws of the state, constitutes a crime involving moral turpitude.

25. Re Sanford Fork & Tool Co., 160 U.S. 247, 255, 16 S.Ct. 291, 293, 40 L.Ed. 414, 416 (1895). Writing for the Supreme Court, Mr. Justice Gray stated:
 When a case has been once decided by this court on appeal, and remanded to the circuit court, whatever was before this court, and disposed of by its decree, is considered as finally settled. The circuit court is bound by the decree as the law of the case, and must carry it into execution according to the mandate.

26. See Hart & Wechsler, The Federal Courts and The Federal System, 420 (1953); Schuylkill Trust Co. v. Commonwealth of Pennsylvania, 302 U.S. 506, 512, 58 S.Ct. 295, 82 L.Ed. 392, 396 (1938); Georgia Ry. & Elec. Co. v. City of Decatur, 297 U.S. 620, 623, 56 S.Ct. 606, 80 L.Ed. 925, 927 (1936); Western States Mach. Co. v. S.S. Hepworth Co., 152 F.2d 79, 81 (2d Cir. 1945), 65 S.Ct. 1414.
 In Hart & Wechsler, ibid., the authors state:
 When the Supreme Court reverses the judgment of a state court, it normally

**618**

It is well established that appellate courts, in the exercise of their jurisdiction, are empowered

> not only to correct error in the judgment entered below, but to make such disposition of the case as justice may at this time require. * * * And in determining what justice now requires the court must consider the changes in fact and in law which have supervened since the decree was entered below.[27]

Also pertinent to resolution of the issues before us is the related doctrine of law of the case. In regard to this doctrine, the court in White v. Higgins [28] stated:

> The doctrine of 'law of the case' is not an inexorable command. It 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their powers.' Messinger v. Anderson, 225 U.S. 436, 444,

32 S.Ct. 739, 740, 56 L.Ed. 1152 * * *. Though the power exists to reopen the points of law already decided, it is a power which will necessarily be exercised sparingly, and only in a clear instance of previous error, to prevent a manifest injustice. The doctrine of law of the case is normally a salutary one in the interest of economy of effort and of narrowing down the issues in successive stages of litigation. In the absence of exceptional circumstances, it would be unfortunate if on second appeal counsel felt free to argue de novo as a matter of course the points decided on previous appeal. See Great Western Telegraph Co. v. Burnham, 162 U.S. 339, 343, 344, 16 S.Ct. 850, 40 L.Ed. 991.[29]

In light of these principles and the supervening changes which have occurred in our education laws as a result of the en-

---

remands the cause for proceedings 'not inconsistent' with the Court's opinion. This mandate leaves the state court free to pass on any other undetermined questions, or even to alter its determination of underlying state law.

27. Watts, Watts & Co. v. Unione Austriaca, 248 U.S. 9, 21, 39 S.Ct. 1, 2, 63 L.Ed. 100, 101 (1918). See also Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 541–542, 61 S.Ct. 347, 85 L.Ed. 327, 329 (1941); Carpenter v. Wabash Ry., 309 U.S. 23, 27, 60 S.Ct. 416, 84 L.Ed. 558, 561 (1940); Patterson v. State of Alabama, 294 U.S. 600, 607, 55 S.Ct. 575, 79 L.Ed. 1082, 1086 (1935); Gulf, C. & S. F. Ry. v. Dennis, 224 U.S. 503, 507, 32 S.Ct. 542, 56 L.Ed. 860, 862 (1912); Dinsmore v. Southern Express Co., 183 U.S. 115, 22 S.Ct. 45, 46 L.Ed. 111, 113 (1901); Brownell v. Kaufman, 102 U.S.App.D.C. 133, 251 F.2d 374, 375 (1957); NLRB v. Continental Baking Co., 221 F.2d 427, 432 (8th Cir. 1955); NLRB v. National Gas Co., 215 F.2d 160, 162–63 (8th Cir. 1954); State of Washington v. United States, 214 F.2d 33, 46–47 (9th Cir.), cert. denied, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679–80 (1954); Zank v. Landon, 205 F.2d 615, 616 (9th Cir. 1953); McMahan v. Hunter, 179 F.2d 661, 663 (10th Cir.), cert. denied, 339 U.S. 968, 70 S.Ct. 985, 94 L.Ed. 1376 (1950); Schaff v. R. W. Claxton, Inc., 79 U.S.App.D.C. 207, 144 F.2d 532, 533 (1944).

In Patterson v. State of Alabama ibid., Mr. Chief Justice Hughes said:

> [W]e have power not only to correct error in the judgment under review but to make such disposition of the case as justice requires. And in determining what justice does require, the Court is bound to consider any change, either in fact or in law, which has supervened since the judgment was entered.

This statement was adopted in its entirety in the Schaff case by Associate Justice Edgerton.

28. 116 F.2d 312, 317 (1st Cir. 1940).

29. See Kaku Nagano v. Brownell, 212 F.2d 262, 263 (7th Cir. 1954), where the court, in reference to the law of the case rule, stated:

> In other words, though the rule that what is said on appeal becomes the law of the case is not an iron-clad rule which denies power in the court to correct its manifest error, it is one of sound policy.

To the same effect, see General Am. Life Ins. Co. v. Anderson, 156 F.2d 615, 619 (6th Cir. 1946); Commissioner of Internal Revenue v. Nechter, 143 F.2d 484, 486 (7th Cir.), cert. denied, 323 U.S. 759, 65 S.Ct. 92, 89 L.Ed. 607 (1944); Brown v. Gessellschaft Fur Drahtlose Tel., 70 App.D.C. 94, 104 F.2d 227, 228 (1939); In re Hallbom's Estate, 189 Minn. 383, 249 N.W. 417, 418 (1933), aff'd sub nom. Pagel v. Pagel, 291 U.S. 473, 54 S.Ct. 497, 78 L.Ed. 921 (1934).

actment of S.L.A.1965, chapters 14 and 41 and S.L.A.1966, chapter 104, I am convinced that this court's initial construction of "immorality" was not in accord with the legislature's intent nor with the public policy of this state. To permit AS 14.20.170 (a) (2)'s definition of immorality to reach these acts of appellants which the majority by their affirmance have labeled immoral, in my view raises issues as to the constitutionality of such a sweeping application of the statute. We previously held that it is our duty to reasonably construe statutes to avoid a danger of unconstitutionality.[30] I think this precept particularly appropriate here.

AS 14.20.170(a) (2)'s definition of "immorality" as conduct "tending to bring the individual concerned or the teaching profession into public disgrace or disrespect" is at best of doubtful significance and, potentially, of unlimited applicability. The Alaska legislature's subsequent enactment of S.L.A.1965, chapter 41, and S.L.A.1966, chapter 104, has limited, in regard to the causes for revocation and nonretention, "immorality" to the commission of crimes involving moral turpitude. Our legislature, by virtue of its passage of S.L.A.1965, chapter 14, has also given statutory recognition to the policy of permitting teachers (outside of school hours) to comment on, and to criticize, school administrators, school boards, and any other public officer.

For the very first time in this case we now have the benefit of an unambiguous manifestation from the legislature concerning its intended delimitation of "immorality." Also by virtue of the legislature's enactment of S.L.A.1965, chapter 14, we have a clear statutory expression of public policy prohibiting restrictions upon the right of teachers to comment and criticize school administrators, school boards, or any other public official.

Under the Supreme Court of the United State's mandate, and the authorities heretofore cited, I would hold that this court's original construction of immorality in AS 14.20.170(a) (2) was incorrect in light of the relevant legislation which has been enacted since this court's original decision in the case at bar was rendered.

Such an analysis and conclusion is not, in my opinion, violative of AS 01.10.090's mandate that "No statute is retrospective unless expressly declared therein." It is not unreasonable to assume that the Supreme Court of the United States was aware of the "general rule on retrospective operation of statutes embodied in AS 01.10.-090" when it remanded the case. Here the three statutory changes were enacted subsequently to, and in relation to, a specific controversy concerning the construction of the term "immorality" as a cause for nonretention. In such circumstances I am of the view that the three statutes can properly be looked to as legislative interpretations of the original AS 14.20.170(a) (2).[31] I do not think that the fact the 1957 legislature rejected the "crime of moral turpitude", definition in favor of the "tending to bring into public disgrace or disrespect" definition precludes the result I reach. The fact of this rejection does not mean that the legislature envisioned that the "tending to bring" definition of immorality would be applied to speech as it was in the case at bar. This last comment leads to the final point I wish to discuss, namely, that of free speech.

## AS TO FREEDOM OF SPEECH

In the Declaration of Rights article of the Alaska Constitution, freedom of speech is guaranteed to the people of Alaska by the following provision:

Every person may freely speak, write, and publish on all subjects, being re-

**30.** Hoffman v. State, 404 P.2d 644, 646 (Alaska 1965); Territory of Alaska v. Craig Enterprises, Inc., 355 P.2d 397, 403 (Alaska 1960).

**31.** See 1 Sutherland, Statutory Construction § 1931 (3d ed. 1943); School Dist.

No. 18 v. Pondera County, 89 Mont. 342, 297 P. 498 (1931); Hintz v. Zion Evangelical United Brethern Church, 13 Wis. 2d 439, 109 N.W.2d 61 (1961); Kennedy v. Truss, 1 Terry 424, 40 Del. 424, 13 A. 2d 431, (Super.Ct.1940).

sponsible for the abuse of that right.[32]

In my view, the majority's conclusion that Watts' conversation with the Framptons was immoral and therefore a cause for his nonretention had denied him his freedom of speech under both the Alaska Constitution and the 1st and 14th Amendments to the United States Constitution.[33]

The philosophical basis of the role that free speech plays in a democratic society has been magnificently stated by Justice Holmes in his dissenting opinion in Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173, 1180 (1919), where he said:

> But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas— that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out. That at any rate is the theory of our Constitution. It is an experiment, as all life is an experiment. Every year if not every day we have to wager our salvation upon some prophecy based upon imperfect knowledge. While that experiment is part of our system I think that we should be eternally vigilant against attempts to check the expressions of opinions that we loathe * * *.[34]

An equally cogent statement of the principles underlying the concept of free speech in our society is that of Justice Brandeis in his concurring opinion in Whitney v. People of State of California, 274 U.S. 357, 375–76, 47 S.Ct. 641, 648, 71 L.Ed. 1095, 1105–06 (1927):

> Those who won our independence * * * believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; *that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government.* They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form. Recognizing, the occasional tyrannies of governing majorities, they amended the Constitution so that

---

32. Alaska Const. art. I, § 5. See also the 1st and 14th Amendments to the United States Constitution.

33. I have shown previously why I believe the issue of appellants' immorality in regard to the Open Letter is not properly before this court. Therefore, this discussion of free speech will be limited essentially to the majority's conclusion that Watts' constitutional rights were not infringed.

34. In 1859, John Stuart Mill wrote:
 The opinion which it is attempted to suppress by authority may possibly be true. Those who desire to suppress it, of course deny its truth; but they are not infallible. They have no authority to decide the question for all mankind, and exclude every other person from the means of judging. To refuse a hearing to an opinion, because they are sure that it is false, is to assume that *their* certainty is the same thing as *absolute* certainty. All silencing of discussion is an assumption of infallibility. Its condemnation may be allowed to rest on this common argument, not the worse for being common. . . . John Stuart Mill, On Liberty 15 (McCallum ed. 1946).

free speech and assembly should be guaranteed.[35] (Emphasis added.)

These principles of freedom of speech articulated in the writing of Justice Holmes and Justice Brandeis are appropriately relevant to analysis of the theory of our own state government and the role which the principle of freedom of speech should have in the democratic society provided for in the Constitution of Alaska.

Freedom of speech is the basic tenet of a self-governing democratic society [36] and has been guaranteed to the people of the State of Alaska by the framers of our constitution. For a democratic society to function it is imperative that the public be informed, and have made available to it reasonable means of obtaining information, on all public issues. And it is here that the principle of freedom of expression plays its crucial part in enabling our citizens to participate in the decision making processes of our democratic society.[37]

In regard to the content of permissible public debate, I believe the statement of the Supreme Court in New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686, 701 (1964), is apposite:

Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.[38]

With these principles in mind, it is appropriate to examine the role that education performs in our current society. Few would contest that the education of our people is

35. See also Justice Black's concurring opinion in Barenblatt v. United States, 360 U.S. 109, 145–146, 79 S.Ct. 1081, 1103, 3 L.Ed.2d 1115, 1140 (1959), where he said:

The First Amendment means to me, however, that the only constitutional way our Government can preserve itself is to leave its people the fullest possible freedom to praise, criticize or discuss, as they see fit, all governmental policies and to suggest, if they desire, that even its most fundamental postulates are bad and should be changed; 'Therein lies the security of the Republic, the very foundation of constitutional government.' On that premise it has grown to greatness. Our Constitution assumes that the common sense of the people and their attachment to our country will enable them, after free discussion, to withstand ideas that are wrong.

See also Justice Black's concurring opinion in Wieman v. Updegraff, 344 U.S. 183, 193, 73 S.Ct. 215, 97 L.Ed. 216, 223 (1952).

36. See Meiklejohn, Free Speech and Its Relation to Self-Government, (1948):

The principle of the freedom of speech springs from the necessities of the program of self-government. It is not a Law of Nature or of Reason in the abstract. It is a deduction from the basic American agreement that public

issues shall be decided by universal suffrage.

37. See Frantz, The First Amendment in The Balance, 71 Yale L.J. 1424 (1962); Emerson, Toward A General Theory of The First Amendment, 72 Yale L.J. 877 (1963).

38. It is also of significance that Justice Brennan, in writing for the court, said:

That erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need * * * to survive,' * * *. 376 U.S. at 271–72, 84 S.Ct. at 721, 11 L.Ed.2d at 701.

Note in Garrison v. State of Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L. Ed.2d 125, 133 (1964), Justice Brennan wrote:

[O]nly those false statements made with the high degree of awareness of their probable falsity demanded by New York Times may be the subject of either civil or criminal sanctions.

39. See Chief Justice Warren's opinion in the school segregation case, Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873, 880 (1954), where these views were voiced in the following manner:

Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our

one of the paramount functions of our state government; is essential in the attainment of a responsible citizenry and to the development of the individual.[39] The role of the teacher in this country's system of education, and in turn education's part in a democratic society, is articulated by Justice Frankfurter in his concurring opinion in Wieman v. Updegraff, 344 U.S. 183, 196–197, 73 S.Ct. 215, 221, 97 L.Ed. 216, 224–225 (1952), in the following manner:

> To regard teachers—in our entire educational system, from the primary grades to the university—as the priests of our democracy is therefore not to indulge in hyperbole. It is the special task of teachers to foster those habits of open-mindedness and critical inquiry which alone make for responsible citizens, who, in turn, make possible an enlightened and effective public opinion. Teachers must fulfill their function by precept and practice, by the very atmosphere which they generate; they must be exemplars of open-mindedness and free inquiry. They cannot carry out their noble task if the conditions for the practice of a responsible and critical mind are denied to them. * * * They must be free to sift evanescent doctrine, qualified by time and circumstances, from that restless, enduring process of extending the bounds of under-

standing and wisdom, to assure which the freedoms of thought, of speech, of inquiry, of worship are guaranteed by the Constitution of the United States against infraction by national or State government.[40]

It is on the basis of the foregoing that I dissent from the majority's treatment of the free speech issue as it relates to appellant Watts.[41] The majority holds that since the "constitutional question" is close it chooses to resolve doubts in appellant Blue's favor, particularly where the record contains "no evidence that false or misleading statements were made." Yet Watts' constitutional rights of freedom of speech remains unvindicated because he spoke "on school premises", "during school hours", (a highly doubtful conclusion of the majority's) "to support a private move to oust the Superintendent", and because this conduct was "immoral." It is undisputed that Watts made no false or misleading statement to the Framptons. I fail to discern the constitutional distinction upon which Watts' speech is denied the very protection the majority now accords to Blue's talk to the longshoremen.

The majority's holding goes a long way in stifling any movement for reform or change in our educational system which happens to originate in the mind of an in-

recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities * * *. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment.

40. Justice Frankfurter also wrote in Wieman v. Updegraff:

That our democracy ultimately rests on public opinion is a platitude of speech but not a commonplace in action. Public opinion is the ultimate reliance of our society only if it be disciplined and responsible. It can be disciplined and responsible only if habits of open-mindedness and of critical inquiry are acquired in the formative years of our citizens. The process of

education has naturally enough been the basis of hope for the perdurance of our democracy on the part of all our great leaders, from Thomas Jefferson onwards.

41. Since I have concluded that appellants did not violate Regulation E–7 of the Seward School Board, I consider it unnecessary to deal with the majority's assertion that "There is no constitutional question associated with the Board's conclusion that publication and circulation of the Open Letter to the general public was substantial non-compliance with Board Regulation E(7)." On the contrary, I am of the opinion that there are constitutional questions of free speech inherent in this issue, particularly in light of the circumstances which I have previously outlined and also in view of the fact that the regulations in no way provided access to public opinion on public issues.

dividual teacher. Under their view, before a teacher could constitutionally attempt to gather support to bring about a change in school administrators, such a goal must have had already attained the status of a public goal. As to any given facet of our educational system, diverse opinions and philosophies are held by the people of this state. The effect of the majority's decision is to discourage the one group that is most intimately aware of the workings and problems of our educational system from making their views known on this most vital of public issues.[42] The majority's attitude is summed up by their reliance upon Adler v. Board of Education[43] and its rationale that even though one is removed from his employment in government service, he is not thereby denied any constitutional rights (i. e., free speech in particular).[44]

I believe that the majority's decision has denied Watts his constitutional right to speak freely as guaranteed by both the Alaska Constitution and the 1st and 14th Amendments to the United States Constitution. Watts had the constitutional right, whether erroneous or not, to be critical of his superintendent; to discuss with his fellow teachers the possibility of effectuating the superintendent's removal and to solicit the support of his fellow teachers for his views.[45]

One of the most important functions of this court is to assure that constitutional rights are vindicated. By today's decision the right of free speech in this state has sustained a serious encroachment. Apparently the principles that free speech encompasses "uninhibited", "robust", and "wide-open" debate on public issues has been shunted aside. In its place has been substituted a holding that cannot fail to curtail discussion among those most intimately concerned with this state's educational system.

42. I agree that any school system must have the means of maintaining proper discipline, screening undesirable teachers, and removing incompetent teachers. If it is necessary to accomplish this by means of a "catch-all" language, then school boards have authority to enact such catch-all regulation, violations of which could be the basis of statutory nonretention or revocation of a teacher's certificate.

43. 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952). See also Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); Sweezy v. State of New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed. 2d 1311 (1957); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), for post Adler decisions of the Supreme Court in the area of academic freedom. In light of these subsequent decisions, I question whether Adler would receive the same treatment today.

44. See Professor Chafee's answer to the Adler philosophy in Thirty-Five Years With Freedom Of Speech, 1 Kan.L.Rev.:
I am disturbed by the common assumption that deprivation of a job connected with the government is not a substantial loss of freedom. The theory is that governmental activity is a special sort of thing and not a general privilege; hence the ousted individual is simply thrust out of a small corner of life, with plenty of other places left open to him. Thus, in sustaining the New York Feinberg Law, the Supreme Court reasoned that a school teacher is not deprived of freedom of speech and assembly when he is thrown out of the public schools. Adler v. Board of Education, supra note 67. In short, when a teacher can think and talk as much as he likes by merely giving up a government job, this is freedom.
Such a theory seems to me to assume what is not so. The man was trained to be a public school teacher and to spend his life in that profession. Since thinking and talking are his business, restrictions on them as a condition of holding his job are peculiarly repugnant, while it is like cutting off his hand for him to go elsewhere. And where else? Private schools are fully staffed and unlikely to take a man who has quit in a controversy. A school teacher is not prepared for a trade and he is too old to make a fresh start. The Court's reasoning would logically make out that disbarment of a lawyer with heterodox opinions is no infringement of freedom of speech and thought.

45. This is to say no more than our legislature has already recognized by statute.